## IN THE UNITED STATES DISTRICT COURT
## FOR NORTHERN DISTRICT OF ILLINOIS,
## EASTERN DIVISION

| | | |
|---|---|---|
| DAVID DIAMOND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| MARK NICHOLLS and SID | ) | Jury Trial Demanded |
| NICHOLLS, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

# COMPLAINT

Plaintiff David Diamond ("Plaintiff"), by his attorneys, brings this complaint and demand for jury trial against Defendants Sid Nicholls and Mark Nicholls to recover losses incurred by, among other things: (A) violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and of Securities and Exchange Commission Rule 10b-5, 17 C.F.R. 240.10b-5; (B) violations of the Illinois Securities Law of 1953, 815 ILCS 5/1, *et seq.*; (C) violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*; (D) breach of the Membership Interest Purchase Agreements between Mark Nicholls and Plaintiff; (E) breach of Mark Nicholls' fiduciary duties to Plaintiff; and (F) common law fraud. In support thereof, Plaintiff alleges as follows:

## INTRODUCTION

1.      Defendant Mark Nicholls and his father, Defendant Sid Nicholls, control a long-term enterprise dedicated to the fraudulent offering and sale of securities. Through an

interconnected group of corporate and other business entities, the pair engaged in a scheme to artificially boost the sale and profits of one entity — Turf Nation, Inc. ("Turf Nation"), a manufacturer and supplier of artificial turf controlled by Sid Nicholls. They did so by using the funds invested in Turf Nation's principal customers — a series of turf installation companies controlled by Mark Nicholls — to purchase excessive amounts of artificial turf at above market rates and far in excess of the customers' ability to profitably pay.

2.      Once the investors' funds were nearly gone, Mark and Sid Nicholls initiated a pair of lawsuits to sweep up the customers' remaining assets and force whatever additional funds they could from Mark's investors. They then intended to market Turf Nation at an artificially high valuation to an unsuspecting buyer. By the time that buyer realizes Turf Nation's profits were built on an unsustainable pattern of sales to now-defunct, family-controlled entities, the Nichollses will have taken the Turf Nation sales proceeds and begun the process again.

3.      Plaintiff in this case is only one of many investors to be taken by the Nicholls family enterprise. The Nichollses are repeating a pattern of conduct they first employed successfully nearly a decade ago, when Mark Nicholls used his prior company — Triexe Management Group ULC, d/b/a Sportexe ("Sportexe") — to artificially inflate the valuation of Sid Nicholls' first turf manufacturing operation: TurfStore.com, Inc.

4.      If Turf Nation is sold, the Nichollses will simply start new companies and repeat their fraud on a new set of unsuspecting investors. Accordingly, Plaintiff brings this Complaint to end the Nicholls enterprise and recover whatever portion of his investment he can.

5.      The Nichollses' scheme depended on a pattern of misrepresentations made to the Plaintiff and others, who invested in the Mark Nicholls-controlled customer entities. Mark Nicholls owned and operated Turf Industry Holdings, LLC ("TIH"), which, as the name implies,

was a holding company with no operations of its own. In turn, TIH owned a family of synthetic turf installation companies that Mark had founded, including Turf Nation's primary customer: UBU Sports, Inc. ("UBU Sports"). At all times prior to October 28, 2016, Mark Nicholls served as Chief Executive Officer of TIH and UBU Sports.

6. Mark Nicholls marketed membership units in TIH to his investors, including Plaintiff, through a series of misrepresentations. These misrepresentations are set forth in detail below, but include, generally, misrepresentations as to (a) Mark Nicholls' prior experience and, in particular, his supposed management and subsequent sale of Sportexe; (b) the extent of Mark Nicholls' own investment in TIH; (c) the past performance of the operating entities and, in particular, UBU Sports; and (d) the number of turf resellers under contract with UBU Sports and the sales made by those resellers.

7. The Nichollses did not attempt to hide the fact that Mark Nicholls' companies purchased turf from Sid Nicholls' manufacturing entity. Mark Nicholls did, however, misrepresent the true nature of the relationship between the entities. At best, father and son largely ignored corporate formalities and managed their companies as if they were internal operating divisions of the same family enterprise. Operations, finance, and management were so thoroughly intermingled that Mark Nicholls actually founded Turf Nation and, at various times, served as one of its officers, while Sid wielded considerable control over whom his son's operating companies paid and also served as UBU Sports' Chief Financial Officer at certain times. Mark Nicholls concealed the companies' intertwined nature from his investors and, instead, represented that they operated as arm's-length enterprises.

8. Sid Nicholls directly participated in a key misrepresentation to Mark Nicholls' investors. As of October 2014, no written supply agreement existed between Turf Nation and

UBU Sports.  Mark Nicholls had, however, located substantial new investors who requested, in their due diligence review, to review UBU Sports' contracts with its suppliers.

9.      To deceive those potential investors, Sid and Mark Nicholls fabricated and backdated a long-term supply contract between Turf Nation and UBU Sports that, notably, extended a $5 million line of credit to UBU Sports.  Mark then provided the contract to the potential investors in order to secure their investment.

10.     However, to avoid the potential liability that might arise from the supply contract, Sid and Mark immediately and secretly sought to terminate it via a notice that Sid sent to Mark and that Mark then preserved, in secret, for over two years.  In the meantime, Mark continued to represent, in writing, to new investors that UBU Sports had a written and binding supply contract with Turf Nation.

11.     In October 2016, after years of losses, the investors wrested control of TIH and UBU Sports from Mark Nicholls in accordance with the entities' governing documents only to find themselves holding nothing but unpayable debts and impossible-to-perform installation contracts — the Mark Nicholls "empire" was built of sand.  Subsequent investigations revealed that Mark Nicholls had entered into a long series of unprofitable contracts in order to book new and ever larger sales, each time using the newest deposit to cover the prior contract's losses and generate the illusion of positive cash flow.  This illusion allowed Mark Nicholls to conceal from his investors a deepening pit of operating losses and debt.

12.     Remaining management quickly discovered the true extent of Mark Nicholls' perfidy and the investors' losses.  UBU Sports supposedly "owed" Turf Nation millions, on paper, for overpriced turf that UBU Sports had no ability to accept or pay for.  Worse yet, Mark Nicholls had entered into multiple contracts for which UBU Sports had accepted deposits — now

vanished — but had no conceivable ability to fulfill. All that was left of UBU Sports was the name and a small employee base that suddenly found itself unemployed.

13. Sid Nicholls, in turn, continues to play his part in the scheme. As soon as his son lost control of TIH and UBU Sports, Turf Nation revealed the "termination notice" Sid had sent to Mark Nicholls' home address over two years earlier. Turf Nation then sued UBU in November of 2016 for $3.4 million — less than the line of credit's maximum amount of $5 million — on the ground that the line of credit had never, truly, existed. Amazingly, Turf Nation also personally sued the investor representative charged with winding down the companies, Joseph Vrankin, for allegedly misdirecting customer deposits that were, in fact, received and spent by Mark Nicholls during his tenure as CEO. Mark Nicholls is now a third-party defendant in Turf Nation's lawsuit.

14. In the course of winding down the companies, Plaintiff learned that Mark Nicholls tried to delete tens of thousands of emails during his final hours at UBU Sports, only to leave them, intact, in his email software's "trash can." These e-mails include countless communications between Sid and Mark Nicholls that serve as the basis for this Complaint and the litigation to come.

15. Plaintiff alone lost approximately $700,000 to the Nicholls family enterprise. The total investor loss as a result of Sid and Mark Nicholls' scheme exceeds $20 million. Plaintiff seeks the full remedies available to him under the law, including compensatory and consequential damages, punitive damages, attorneys' fees and costs, pre-judgment interest on all amounts awarded and such other amounts as the Court proper.

## PARTIES

16.    Plaintiff is a purchaser of membership interests in TIH who was induced to make his investments due to the fraudulent acts described further below.

17.    Plaintiff is a resident and citizen of Illinois. In May 2014, Plaintiff invested $250,000 in TIH through the purchase of Series A Preferred Units pursuant to the May 2014 MIPA. In July 2014, Plaintiff invested $250,000 in TIH through the purchase of Series A Preferred Units pursuant to Membership Interest Purchase Agreement ("July 2014 MIPA").  In February 2016, Plaintiff invested an additional (a) $105,000 through the purchase of a Series B Convertible Note ("Diamond Series B Note") pursuant to the Series B Note Purchase Agreement and (b) $95,000 through the purchase of a Series C Convertible Note ("Diamond Series C Note") pursuant to the Series C Note Purchase Agreement. The Diamond Series B Note and Diamond Series C Note were automatically converted into Series B Preferred Units and Series C Preferred Units, respectively, as of September 30, 2016. True and correct copies of the July 2014 MIPA is attached hereto as Exhibit A. A true and correct copy of the May 2014 MIPA is attached hereto in Exhibit B. True and correct copies of the Series B Note Purchase Agreement and Series C Note Purchase Agreement are attached hereto in Exhibit C.

18.    Defendant Mark Nicholls is a resident of the Canadian Province of Ontario. Mark Nicholls is the founder and former Chief Executive Officer and sole director of UBU Sports, a Delaware corporation with its principal place of business in Downers Grove, Illinois and that is now known as Artificial Turf Sports Field, Inc. Mark Nicholls is also the founder and former Chief Executive Officer of TIH, a Delaware limited liability company which owns one hundred *percent* of UBU Sports and which Mark Nicholls created as a vehicle for investment in UBU

Sports. Prior to the sales to investors described in this Complaint, Mark Nicholls was the one hundred *percent* owner of TIH. Mark Nicholls is the son of Defendant Sid Nicholls.

19.     TIH is a manager-managed limited liability company. The manager consisted of a Board of Directors which, in turn, delegated specific power to the office of the Chief Executive Officer.  At all relevant times prior to October 28, 2016, Mark Nicholls was a Director as well as the Chief Executive Officer of TIH.

20.     Defendant Sid Nicholls is a resident of the Canadian Province of Ontario. He is the operator of Turf Nation, a manufacturer and supplier of synthetic turf products with its principal place of business located in Dalton, Georgia.

## JURISDICTION AND VENUE

21.     This Court has original jurisdiction over the subject matter of Counts I and III of this Complaint pursuant to 28 U.S.C. § 1331 as those Counts arise under the Constitution, laws or treaties of the United States.  This Court has supplemental jurisdiction over the remaining Counts pursuant to 28 U.S.C. § 1367(a) as they are so related to claims in the action with the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

22.     This Court has personal jurisdiction over Defendant Mark Nicholls because he has purposefully availed himself of the benefits and protections afforded by the laws of the State of Illinois and has further established minimum contacts with Illinois by, among other things, (a) transacting business in Illinois, (b) making and performing contracts or promises substantially connected with Illinois, (c) breaching fiduciary duties in Illinois, and (d) performing duties as a director or officer of a corporation having its principal place of business within Illinois. These

acts satisfy the U.S. and Illinois Constitutional requirements of minimum contacts and the provisions of the Illinois long-arm statute, 735 ILCS 5/2-209(a).

23.     This Court has personal jurisdiction over Defendant Sid Nicholls because he has purposefully availed himself of the benefits and protections afforded by the laws of the State of Illinois and has further purposefully established minimum contacts with Illinois by, among other things, (a) transacting business in Illinois, (b) making and performing contracts and promises substantially connected with Illinois. These acts satisfy the U.S. and Illinois Constitutional requirements of minimum contacts and the provisions of the Illinois long-arm statute, 735 ILCS 5/2-209(a).

24.     Venue is proper in this District pursuant 28 USC §1391(b) because a substantial part of the events and omissions giving rise to the claims occurred in the District and a substantial part of the property that is the subject of the action is or was situated in the District.

## THE FORMATION OF UBU SPORTS AND TURF INDUSTRY HOLDINGS

25.     On July 3, 2008, Mark Nicholls formed a Delaware corporation named Turf Industry, Inc.  Turf Industry, Inc., was, at the time of formation, wholly-owned by Mark Nicholls.

26.     On August 5, 2008, Mark Nicholls formed a Delaware corporation named UBU Sports, Inc.  UBU Sports was a wholly-owned subsidiary of Turf Industry, Inc. UBU Sports' primary business was the sale of synthetic turf surfaces for sports field and facilities.

27.     On December 18, 2008, Mark Nicholls formed a Delaware corporation named Turfscape, Inc. ("Turfscape").  Turfscape was a wholly-owned subsidiary of Turf Industry, Inc. Turfscape's primary business was the sale of franchises that would, in turn, install artificial turf for landscaping applications.

28.     On January 22, 2009, Mark Nicholls formed Turf Nation as a Delaware corporation.  Both Mark and Sid Nicholls served as directors of Turf Nation.  At some point, Sid Nicholls assumed primary responsibility for and *de facto* control over Turf Nation.

29.     Sid Nicholls nevertheless shared *de facto* control of Turf Nation with his son, Mark Nicholls. Mark Nicholls served as the President of Turf Nation for some or all of 2011 and 2012.  Mark Nicholls today owns some or all of the issued shares of Turf Nation.    Mark Nicholls continues to serve as a director or officer of Turf Nation or maintains *de facto* authority and control over Turf Nation with his father.

30.     Turf Nation was, for all relevant time periods, UBU Sports and Turfscape's sole supplier of artificial turf.

31.     Between January 2009 and January 2013, UBU Sports purchased substantial quantities of artificial turf from Turf Nation pursuant to a *de facto* line of credit extended from Turf Nation to UBU Sports.

32.     By January 2013, the Nichollses realized they could not continue to inflate the earnings and profitability of Turf Nation without an infusion of investment capital into the customer entities controlled by Mark Nicholls.

33.     On January 10, 2013, Mark Nicholls formed TIH as a Georgia limited liability company.  Mark Nicholls then transferred his ownership of Turf Industry, Inc. to TIH, as well as his ownership of another, related company: Outfill, Inc., a company that specialized in field infill reclamation.

34.     Mark Nicholls formed TIH as a vehicle for investment in UBU Sports, Turfscape, and Outfill.  Investors could purchase interests in TIH and, thereby, invest in all three entities.

35.     The Nichollses intended to use whatever investment money they could obtain to purchase as much artificial turf from Turf Nation, at above market prices, as possible, irrespective of the non-profitability of the customer entities or the investors' inability to realize a return on their investment.

36.     If nothing else, the Nichollses could use the investment funds to pay down the "balance" owed to Turf Nation, boost its profitability and then launch a new round of turf purchases for which the customer entities could not, ultimately, pay.

## THE MARKETING OF TURF INDUSTRY HOLDINGS

37.     By late 2013, Mark Nicholls with the assistance and participation of Sid Nicholls, had developed an investment summary document and had begun to market investments in Turf Industry Holdings.

38.     Mark Nicholls met with investors and potential investors several times during 2014 and 2015, including, but not limited to:

   a.     A telephone conference with National Securities on January 23, 2014;

   b.     A telephone conference with Ladenburg Thalmann on January 28, 2014;

   c.     A telephone conference with Colebrooke Capital on January 29, 2014;

   d.     A telephone conference with Striker Partners and Inverness Graham on February 3, 2014;

   e.     A telephone conference with the Peakstone Group on February 4, 2014;

   f.     Meetings and communications with Andrew Nolan in Chicago, Illinois, in February through May 2014;

   g.     Meetings and communications with Plaintiff in Chicago, Illinois, in January through May 2014;

   h.     Meetings and communications with Brian Lattman in June 2014;

i.      Meetings and communications with Hilary Jandl and Steve Burke, trustees of the TUI Irrevocable Trust of 2012, in June 2014;

j.      Meetings and communications with Dean Schulhof in June 2014

k.      A meeting with JDJ Capital Partners in New York City on June 5, 2014;

l.      Meetings and communications with Anthony Killough in July 2014;

m.      Meetings and communications with John Muehlstein, trustee of the Peer Pedersen Trust dated February 1, 1999, in July 2014;

n.      A meeting with The Hudson + East Partnership in New York City on July 2, 2014;

o.      A meeting with Crow Holdings in Dallas, Texas, on August 26, 2014;

p.      A meeting with Copper Beech Capital in Dallas, Texas, on August 26, 2014;

q.      A meeting with Clover Capital in Chicago, Illinois, on August 28, 2014;

r.      A conference call with Copper Beech Capital on September 5, 2014;

s.      A conference call with Aaron Frank and Ari Levy on September 11, 2014;

t.      A conference call with Jason Faucett on September 17, 2014;

u.      A meeting with the Flynn family office on October 8, 2014;

v.      Meeting and communications with Caryn and John Gallop in January 2015;

w.      Meetings and communications with Randall Thrall in February 2015;

x.      Meetings and communications with Michael Arrington as trustee of the Michael Brown Arrington Trust Dated August 5, 2002, in April 2015; and

y.      Meetings and communications with representatives of the Mitchell Trust in April through June of 2015.

39.     During those meetings and conferences, and in the subsequent negotiations and transactional documents, Mark Nicholls made a series of misrepresentations of existing fact for the purpose of inducing the purchase of securities in Turf Industry Holdings.

**A.** **Mark Nicholls Lied About Sportexe And His Prior Industry Experience**

40.     A substantial part of Mark Nicholls' "pitch" to potential investors revolved around his supposed prior success in the turf industry and, in particular, the massive success of his prior company, Sportexe, and his extremely lucrative sale of that business.

41.     Mark Nicholls' investment proposal specifically contemplated that he would retain majority control of TIH and its subsidiaries and would continue to lead those entities as its CEO after the investments were funded.

42.     In general, the experience of the incumbent Founder/CEO of the company seeking investments is an absolutely critical factor in determining whether to invest. To financial professionals considering an investment, a Founder/CEO's "track record" of success in a relevant industry is arguably more important than financial projections because it is backward looking and supposedly based on hard historic facts and not hopeful projections.

43.     Accordingly, Mark Nicholls' prior experience was a material factor in the decision of Mark's investors, including Plaintiff, to invest in Turf Industry Holdings and Plaintiff relied upon Mark's representations as to that experience.

44.     Realizing this, Mark Nicholls invented a fictitious personal success story of the founding, operation, and sale of his previous artificial turf business, Sportexe.

45.     Mark Nicholls told Plaintiff and other investors and potential investors that he had sold Sportexe to Shaw Industries, a subsidiary of Berkshire Hathaway, for 26 times earnings which, he indicated, resulted in a sales price of approximately $50 million (though to some potential investors he claimed the price was as high as $100 million). Mark Nicholls told Plaintiff and other investors that he personally netted $6.5 million from the sale after taxes and, even, after surrendering as much as half of the proceeds in a divorce settlement.

46.     Mark Nicholls told Plaintiff and other investors and potential investors that after the sale of Sportexe, Shaw Industries asked him to stay on as CEO of its synthetic turf division. Mark Nicholls claimed he voluntarily left because he disagreed with the strategic direction of the new owner.

47.     What Mark Nicholls told Plaintiff was not publicly-available or verifiable information.  Plaintiff had no easy manner of independently verifying these representations, nor any apparent reason to doubt Mark Nicholls.

48.     In late 2016, long after making his investments in TIH, Plaintiff learned that Mark Nicholls' oft-told claims about Sportexe were lies.  In fact, Mark Nicholls did not sell Sportexe for 26 times earnings, nor did Shaw Industries purchase Sportexe for anything near $50 million. Plaintiff also learned that Mark Nicholls did not leave Sportexe voluntarily; he was in fact fired from Sportexe nearly two years before the sale of Sportexe to Shaw Industries. He did not receive any portion of the Sportexe sale and was never offered the position of CEO of Shaw Industries' synthetic turf division.

49.     In fact, Mark Nicholls had nearly run Sportexe into the ground. Indeed, the facts concerning Mark Nicholls' disastrous management of Sportexe were eerily similar the events of this case.

50.     Like UBU Sports, Sportexe's principal business was the installation of synthetic turf surfaces.  Like UBU Sports, Sportexe's principal supplier of synthetic turf was a business operated by Mark's father Sid Nicholls: at this time, an entity known as Turfstore.com.

51.     As of 2003, Sportexe was nearly out of cash due to the same aggressive, profitless sales practices and overpriced turf purchases that would later harm UBU Sports.

13

52.     At or around this time, Mark Nicholls convinced the Art Modell family office to invest more than $20 million in Sportexe.  A few years later, however, it was apparent that Mark Nicholls had no intention of leading Sportexe to profitability. In 2007, Art Modell's family office brought in a private equity firm to turn Sportexe around.  The private equity firm, Insight Equity, initially kept Mark Nicholls on board to lead the business. After a short time, however, Insight Equity terminated Mark Nicholls.

53.     At approximately the same time, Sid Nicholls sold Turfstore.com to a German entity named Polytan GmbH for approximately $12 million.  Sid Nicholls sold Turfstore.com at a valuation artificially inflated by the unsustainable purchases of the Mark Nicholls-controlled customer entity, Sportexe.

54.     It was Insight Equity — not Mark Nicholls — that turned Sportexe around and then sold Sportexe to Shaw Industries.  The sale to Shaw Industries took place more than two years after Mark Nicholls was terminated from Sportexe at a price of $11 million — approximately one fifth of what Mark Nicholls had claimed.

55.     Mark Nicholls received no portion of the sales price.  Instead, he received a few hundred thousand dollars as part of a settlement and severance agreement with Insight Equity.

56.     In sum, if Sportexe was a success at all, and that is debatable, it was despite of Mark Nicholls, not because of him.

57.     Mark Nicholls' lies concerning his past successes were not mere puffery or barroom embellishments. Rather, they were the retroactive, 180-degree mischaracterizations of failures as if they were successes.

58.     Mark Nicholls knew in advance that his false story of his past Sportexe triumphs would have the effect of inducing investment into TIH and, in fact, it did have that effect.

14

59.     Mark Nicholls' misrepresentations regarding his experience at Sportexe were deliberate, and undertaken with an actual intent that they be relied upon.

60.     Plaintiff did, in fact, rely upon those misrepresentations in connection with his purchase of securities in TIH, to his detriment.

**B.      Mark Nicholls Lied About His Personal Wealth And Investment In TIH**

61.     Another critical component of Mark Nicholls' pitch to Plaintiff and other investors was his claim that he had personally invested $6.5 million in TIH and that this sum represented the entirety of his personal wealth.

62.     Mark Nicholls told Plaintiff that he capitalized TIH with the $6.5 million in net proceeds from the sale of Sportexe.

63.     Mark Nicholls regularly told Plaintiff and others that he had invested the full $6.5 million in TIH in order to ensure that his personal interests were aligned with the interests of potential new investors.

64.     Mark Nicholls' alleged personal financial commitment to TIH was a material factor in Plaintiff's decision to invest in TIH.  Potential investors find it comforting and in fact often demand that the party seeking the investment, in this case Mark Nicholls, is entirely committed to the endeavor and has "skin in the game."  This is intended to align the interests of founders with those of the incoming investors.

65.     Mark Nicholls did not in fact receive a $6.5 million payment for the sale of Sportexe. The sale of Sportexe was negotiated and closed after Mark Nicholls was fired.

66.     At the time he was fired by Sportexe, Mark Nicholls in fact owed it $360,000. After his termination, Mark Nicholls and Sportexe entered into a settlement agreement under

which Sportexe paid $248,000 in exchange for Mark Nicholls' equity interest and in lieu of his severance.

67.     Prior to seeking investors, Mark Nicholls caused Turf Industry Inc. to carry, on its books, an alleged multi-million "loan from shareholder." Mark used this "loan" to remove money from the company as he needed without declaring it as income by, instead, characterizing it a "loan repayment."

68.     Mark Nicholls never invested $6.5 million in TIH or its subsidiaries.

69.     To the extent TIH or its subsidiaries were capitalized, prior to May 2014, in any amount in excess of $248,000, the funds required for that initial capitalization came from some source other than Mark Nicholls.

70.     Turf Industry, Inc., UBU Sports, Turfscape and Outfill, Inc. were originally capitalized with funds likely provided by Sid Nicholls — likely a portion of the Turfstore.com sales proceeds.

71.     Mark Nicholls was not the only owner or beneficial owner of the equity interests in TIH and UBU Sports that he caused to be sold to his investors, including Plaintiff.

72.     Either Sid Nicholls or the enterprise operated by Mark and Sid Nicholls was the true owner or beneficial owner of TIH and its subsidiaries at the time Mark Nicholls sought investors.

73.     Sid Nicholls or the enterprise operated by Mark and Sid Nicholls therefore maintained *de facto* control of TIH and its subsidiaries or shared that *de facto* control with Mark Nicholls.

74. Mark and Sid Nicholls knew in advance that the false story of Mark Nicholls' personal investment of a sizable personal fortune would have the effect of inducing investment into TIH and, in fact, it did have that effect.

75. Mark Nicholls' misrepresentations regarding his personal investment in TIH were deliberate, and undertaken with an actual intent that they be relied upon.

76. Plaintiff and other investors did, in fact, rely upon those misrepresentations in connection with their purchase of securities in TIH, to their detriment.

**C.     Mark Nicholls Misrepresented UBU Sports' Royalty Revenues**

77. UBU Sports' business relied, in part, on a network of resellers who licensed UBU Sports' brand name and related trademarks in connection with the sale and installation of artificial turf.  These resellers would purchase the artificial turf from Turf Nation and install it themselves. UBU Sports would then realize a royalty from the brand license.

78. During his tenure as CEO of UBU Sports and TIH, Mark Nicholls had primary responsibility for sales for management of UBU Sports' reseller network.  There was no person within UBU Sports or TIH in a better position than Mark Nicholls to know the truth of those entities' financial condition, the matters and sales they had under contract, the royalties and revenues they had under contract and the actual revenues and royalties received or expected to be received at any given time.

79. Mark Nicholls routinely misrepresented the number of resellers under contract with UBU Sports, the number of sales made by those resellers to date and the amount of royalties under contract and owed to UBU Sports.

80.     For example, in his February and March 2014 meetings with potential investors, including Plaintiff, Mark Nicholls misrepresented the number of resellers under contract with UBU Sports as well as the number of sales those resellers had already made.

81.     In documents provided to and oral representations made to potential investors during this period, Mark Nicholls represented that twenty-two (22) resellers had entered into resale and licensing agreements with UBU Sports.

82.     He further represented that these twenty-two (22) resellers had already secured contracts for the installation of forty-seven (47) sports fields with an expected total royalty to UBU Sports of $711,535.00.  Mark Nicholls represented that this amount represented thirty-four *percent* (34%) of UBU Sports' budgeted royalty income for the year.

83.     Mark Nicholls made these misrepresentations with knowledge that they would make UBU Sports highly desirable to investors.  First, investors would believe that a substantial portion of UBU Sports' revenue came with no corresponding costs and, instead, represented a highly profitable addition to the bottom line.  Second, investors would believe that if, by the end of February 2014, UBU Sports' resellers had already executed contracts that would result royalties equally thirty-four *percent* (34%) of UBU Sports' budgeted royalty revenue for the year, then UBU Sports was likely to far exceed royalty income expectations in 2014.

84.     Similarly, in documents provided to and oral representations made to potential investors in June and July 2014, Mark Nicholls represented that UBU Sports' resellers had already secured contracts for the installation of one hundred and six (106) sports fields with an expected total royalty to UBU Sports of $1,567,740.00.  Mark Nicholls represented that this amount represented fifty-four *percent* (54%) of UBU Sports' budgeted royalty income for the year.

85. In fact, UBU Sports' resellers had not secured one hundred and six (106) or, even forty-seven (47) installation projects, and UBU Sports did not have $711,535.00 and $1,567,740.00 of royalties under contract by the close of February and May 2014, respectively.

86. On the contrary, UBU Sports' royalty revenue for the *entire* year of 2014 was $204,732.74. Mark Nicholls' representations were knowingly false.

87. Mark Nicholls' misrepresentations continued well into 2015 as he sought additional investors.

88. For example, Mark Nicholls told certain investors in March 2015 that UBU Sports' resellers had secured installation projects pursuant to which UBU Sports would receive $275,400 in royalty revenue and that said revenues were "under contract."

89. This representation was false. UBU Sports' royalty revenue for the *entire* year of 2015 was $212,286.34.

90. Mark Nicholls knew in advance that the false stories of UBU Sports' contracted-for royalty revenue would have the effect of inducing investment into TIH and, in fact, it did have that effect.

91. Mark Nicholls' misrepresentations regarding UBU Sports' royalty revenues were deliberate, and undertaken with an actual intent that they be relied upon.

92. Plaintiff did, in fact, rely upon those misrepresentations in connection with his purchase of securities in TIH, to his detriment.

**D. Mark Nicholls Misrepresented UBU Sports' Sales And Contracted-For Revenues**

93. Mark Nicholls also misrepresented UBU Sports' own sales and the amount of revenues it had under contract.

94. For example, in presentations to investors in March and April 2014, Mark Nicholls stated in writing and orally that, by March 7, 2014, UBU Sports had already secured

contracts representing $7,589,036.00 in revenue and that this figure represented fifty-four *percent* (54%) of UBU Sports' total year revenue target.

95.     In fact, UBU Sports received a total of $4,693,871.25 in revenue for the entire year of 2014.

96.     Similarly, in documents provided to and oral representations made to potential investors in June and July 2014 Mark Nicholls represented that, by the close of May 2014, UBU Sports' itself had already secured contracts twenty-two (22) contracts for the installation of sports fields with an expected total revenue to UBU Sports of $4,721,941.00. Mark Nicholls represented that this amount represented two hundred and sixty-two *percent* (262%) of UBU Sports' budgeted direct sales and installation income for the year.

97.     Mark Nicholls made these misrepresentations with knowledge that they would make UBU Sports highly desirable to investors. Mark Nicholls intended for investors to believe that UBU Sports already had two hundred and sixty-two *percent* (262%) of its budgeted direct sales revenue under contract by the close of May 2014 and so, therefore, UBU Sports was likely to far exceed direct sales income expectations in 2014.

98.     UBU Sports did not, in fact, have $4,721,941.00 in direct sales and installation projects under contract by the close of May 2014.

99.     On the contrary, UBU Sports' revenue from direct sales and installation projects for the *entire* year of 2014 was $3,667,317.51. Mark Nicholls' representations were knowingly false.

100.     Mark Nicholls knew in advance that the false story of UBU Sports' contracted-for direct sales and installation revenue to date would have the effect of inducing investment into TIH and, in fact, it did have that effect.

101.    In those same communications, Mark Nicholls represented that as of the close of May 2014, UBU Sports had total revenue of $10,227,181 under contract. This representation was false.

102.    In fact, UBU Sports received a total of $4,693,871.25 in revenue for the entire year of 2014.

103.    Mark Nicholls' misrepresentations continued well into 2015 as he sought additional investors.

104.    For example, Mark Nicholls directed an employee to tell representatives of investors that as of March 31, 2015, UBU Sports had $ 6,358,100.00 in revenues under contract.

105.    This representation was false. In fact, UBU Sports' revenue for the entire year of 2015 totaled only $6,293,046.51.

106.    Mark Nicholls' misrepresentations regarding UBU Sports' revenues were deliberate and knowing, and undertaken with an actual intent that they be relied upon.

107.    Plaintiff did, in fact, rely upon those misrepresentations in connection with his purchase of securities in TIH, to his detriment.

**E.    Mark And Sid Nicholls Fabricated And Backdated A Critical Supply Contract**

108.    In or about August 2014, Mark Nicholls was introduced to a group of investors collectively referred to as "AWP" (the "AWP Investors").

109.    Mark Nicholls represented to the AWP Investors, and to all subsequent investors, that UBU Sports' relationship with Turf Nation was arm's-length, and on par with any other, similar supplier relationship.

110.    The AWP Investors conducted due diligence in connection with its decision to invest in TIH. A key due diligence item was confirmation of the pre-existence of a stable,

formalized supply and manufacture contract between UBU and its primary supplier, Turf Nation. The AWP Investors asked Mark Nicholls for a copy of that important contract.

111.    Potential investors carefully review a business organization's supply and distribution chains before making an investment.  To an artificial turf installation company, the existence of a formal contract ensuring its key suppliers' and manufacturers' obligation to supply artificial turf is, obviously, important.  Any interruption in the delivery of artificial turf to a company specializing in artificial turf installation could, obviously, prove fatal.

112.    In response to the AWP Investors' requests, Mark Nicholls produced a copy of a written supply agreement between Turf Nation and UBU Sports. The agreement was dated January 15, 2013. A copy of this agreement is attached hereto as Exhibit D (the "Turf Nation Contract").

113.    Section 5(e) of the Turf Nation Contract creates a $5,000,000 revolving line of credit provided by Turf Nation to UBU Sports. To the AWP Investors and all subsequent investors (including Plaintiff), such a provision appeared to be highly valuable for UBU Sports because it ensured continuity of turf delivery and operations even when UBU Sports had low cash flow.  The line of credit also ensured that UBU Sports would be operationally capitalized with a large amount of debt capital, which is a boon to equity investors seeking leverage and higher returns on equity.

114.    The Turf Nation Contract is defined as a "Material Contract" in Section 4(m) of the November 2014 MIPA, executed by certain AWP Investors.  A true and correct copy of this Agreement is included in Exhibit E.

115.    Mark Nicholls personally signed the MIPA twice, once in his personal capacity as "founder," and a second time as CEO of TIH.

116.    TIH represented and warranted, in Section 4(m) of the MIPA, that "[a]ll of the Material Contracts are valid, binding and in full force and effect in all material respects …."

117.    In Section 5(c) of the MIPA, Mark Nicholls personally represented and warranted that all of TIH's representations and warranties regarding the Material Contracts in Section 4(m) of the MIPA were true and complete.

118.    In reality, however, the Turf Nation Contract was a wholesale fabrication (the legal enforceability of which is, today, an open question), created and backdated by Mark and Sid Nicholls in October 2014 for the express purpose and with the specific, knowing, and wrongful intent of inducing Plaintiff and others to invest in TIH.

119.    To be clear, UBU Sports had no written agreement with Turf Nation in January 2013 or at any time before October 2014, when the AWP Investors requested a copy of a written supply agreement between UBU Sports and Turf Nation.

120.    When the AWP Investors requested to see and inspect a written supply agreement between UBU Sports and Turf Nation, Mark Nicholls had an opportunity to truthfully confess that UBU Sports had no such agreement.

121.    Mark Nicholls feared, however, that the absence of such essential documentation would "spook" the AWP Investors and they would, therefore, decline to invest in TIH.

122.    Accordingly, Mark Nicholls and Sid Nicholls expressly and overtly fabricated the Turf Nation Contract, as documented in a series of recently recovered emails between them. True and correct copies of these e-mails are attached hereto as Exhibit F.

123.    On the evening of Saturday, October 4, 2014, Mark Nicholls emailed Sid Nicholls stating that he could not find any supply agreement between the UBU Sports and Turf Nation.

Mark Nicholls asked his father if he could find a supply agreement. If his father could not find a supply agreement, Mark stated, "I will start creating one mid-day tomorrow…"

124. On Sunday morning, October 5, 2014, Sid Nicholls replied: "MARK I COULDN'T FIND THE MANUFACTURING CONTRACT EITHER! SORRY!"

125. Later that morning, Mark Nicholls told Sid Nicholls that he "found a draft from 2008" and would send a "new draft" supply contract with Turf Nation. Mark Nicholls went on to say: "As you know I have time pressure to get this turned around ASAP, *so I don't spook the investor.*" (emphasis added). The only "investor" to whom Mark Nicholls could have been referring, at that time, was the AWP Investors group.

126. At 8:45 that evening, Mark Nicholls sent Sid Nicholls a draft contract between UBU Sports and Sid Nicholls' former entity, Turfstore.com, dated January 15, 2013. Mark Nicholls said:

> Can you please review and let me know if this is acceptable to sign? I will then produce a separate Turfstore and Turf Nation version. *This is time sensitive* so whatever you can do to make this a priority is appreciated.

(emphasis added).

127. At 10:12 Sunday evening, Sid Nicholls responded that the contract Mark sent was "RIDICULOUS." Sid Nicholls then instructed his son to draft the contract as follows: "SEND ME SOMETHING LESS THAN 7 PAGES AND I WILL REVIEW IT. KEEP IT SIMPLE."

128. At 7:36 Monday morning, October 6, 2014, Mark Nicholls emailed Sid Nicholls: "Dad, call me this morning at your convenience and we can discuss what needs to be changed. Mark."

129. Shortly thereafter, Mark and Sid Nicholls produced the Turf Nation Contract for the AWP Investors' inspection, *backdated by twenty-one (21) months to January 15, 2013.*

Mark and Sid Nicholls had, furthermore, gone to the trouble to personally initial each page of the Turf Nation Contract in the lower right hand corner.

130.    At no time did either Defendant indicate to the AWP Investors or any subsequent investor (including Plaintiff) that the Turf Nation Contract was not, in fact, executed in January 2013 and had, in fact, only just been created.

131.    Mark and Sid Nicholls knew in advance that the creation and backdating of the Turf Nation Contract and Mark Nicholls' concurrent misrepresentation that the Contract had existed since January 2013 would have the effect of inducing investment into TIH and, in fact, it did have that effect.

132.    Mark Nicholls' and Sid Nicholls' misrepresentations regarding the Turf Nation Contract, including the misrepresentation inherent in the contract itself, were deliberate, and undertaken with an actual intent that potential investors rely upon them.

133.    Plaintiff did, in fact, rely upon those misrepresentations in connection with his purchase of securities in TIH, to his detriment.

134.    Had any investor known, at the time of their investment, that the Turf Nation Contract had been secretly drafted and backdated, only to be representing as a contract long in force, such knowledge would have prevented the closing of the investment transaction on November 25, 2014 and any subsequent transactions as well.

**F.  Sid And Mark Nicholls Clandestinely Purported To "Terminate" The Turf Nation Contract And Concealed The "Termination"**

135.    Sid and Mark Nicholls had no intention of abiding by a contract under which UBU Sports could purchase $5 million worth of turf on credit from Turf Nation or, for that matter, for Turf Nation to actually be liable to UBU Sports under any circumstance.

136.    Accordingly, in early November 2014, Sid Nicholls drafted a letter purporting to give thirty (30) days' notice of Turf Nation's termination of the Turf Nation Contract and sent the letter via certified mail — not to UBU Sports' principal place of business in Downers Grove, Illinois, but to his son's home in Ontario, Canada.  A true and correct copy of the purported "termination letter" is attached hereto as Exhibit G.

137.    Mark Nicholls did not inform Plaintiff, his investors, the TIH Board of Managers, or any of TIH's or UBU Sports' management or employees that he had received Turf Nation's purported termination of the Turf Nation Contract.

138.    The clandestine, purported termination of the Turf Nation Contract just one month after it was drafted and backdated demonstrates that the Sid and Mark Nicholls did not innocently enter into a retroactive contract or accidently backdate a document.

139.    On the contrary, the clandestine termination demonstrates their intent, at the time the Turf Nation Contract was drafted, backdated and supplied to the AWP Investors, not to abide by that agreement.

140.    In fact, by November 25, 2014, when Mark Nicholls represented, in the AWP MIPA, that the Turf Nation Contract was "valid, binding and in full force and effect in all material respects," the Contract had, supposedly, already been terminated for nearly two weeks.

141.    Mark Nicholls and Sid Nicholls continued to hide the purported termination of the Turf Nation Contract in order to induce Plaintiff and others to continue making additional

investments in TIH and also to induce them to not exercise their rights to revisit their previous decisions concerning investments already made.

142.    In October 2016, the TIH's Board of Directors terminated Mark Nicholls' employment in accordance with the terms of TIH's Operating Agreement.  Shortly thereafter, a debt investment was converted to equity, thereby diluting Mark Nicholls' ownership of TIH to a minority status (less than 8.5%).

143.    At the time of Nicholls' termination, the Board of Directors believed that UBU Sports still had a $5 million line of credit with Turf Nation.  The Board believed that, by pursuing a more prudent sales strategy and purchasing turf on that credit line, they could reverse UBU Sports' financial condition over time and recover the investors' funds.

144.    On or about November 22, 2016, however, Turf Nation's lawyers finally revealed the "termination notice" that Sid Nicholls had sent to Mark Nicholls' Canadian home address over two years earlier.  Turf Nation, ostensibly controlled by Sid Nicholls, then sued UBU Sports in January of 2017 for $3.4 million — less than the line of credit's maximum amount.

145.    In June and July 2016, Sid and Mark Nicholls began to market Turf Nation to prospective buyers at a valuation of $18 million.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Securities and Exchange Commission Rule 10b-5

146.    Plaintiff incorporates by reference paragraphs 1 through 145 above as though fully set forth herein.

147.    Mark and Sid Nicholls violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. 240.10b-5, in that they:

(a)    employed devices, schemes and artifices to defraud;

27

(b)      made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c)      engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff in connection with purchases of TIH securities.

148.    Mark Nicholls made false representations of material fact to Plaintiff, as set forth in Paragraphs 37–145 of this Complaint.

149.    Mark Nicholls made these knowingly false representations of material fact with the willful and fraudulent intent to induce reliance on them and, by inducing that reliance, secure the investments described in Paragraph 17 of this Complaint.

150.    Prior to October 28, 2016, Sid Nicholls possesses the direct or indirect power to direct or cause the direction of management and policies of TIH, UBU Sports and his son, Mark Nicholls.

151.    Relative to TIH, UBU Sports and Mark Nicholls, Sid Nicholls was, at all relevant times, a controlling person.

152.    Sid Nicholls acted in concert with Mark Nicholls to make the knowingly false representations of material fact described in Paragraphs 37-145 of this Complaint.

153.    Sid Nicholls made false representations of material fact to Plaintiff, as set forth in Paragraphs 108-145 of this Complaint, by fabricating the Turf Nation Contract with the private understanding that it was not a valid contract between Turf Nation and UBU Sports and that it would, instead, be immediately terminated.

154. Sid Nicholls made the knowingly false representations of material fact embodied by the Turf Nation Contract with the willful and fraudulent intent to induce reliance on them and, by inducing that reliance, secure the investments described in Paragraph 17 of this Complaint.

155. As a Director and Chief Executive Officer, Mark Nicholls owed a fiduciary duty to Plaintiff.

156. Mark Nicholls concealed material facts in violation of those duties, Section 10(b) of the Exchange Act and SEC Rule 10b-5, by failing to disclose the truth of the facts referred to above as well as by concealing his receipt of Sid Nicholls' purported termination of the Turf Nation Contract.

157. The membership interests and notes described in those paragraphs constitute "securities" as defined in Section 3(a) of the Exchange Act, 15 U.S.C. § 78c(a)(12).

158. Mark and Sid Nicholls made these false representations and omissions of material fact in connection with the sale of securities, namely, the aforementioned membership interests and notes.

159. Until late 2016, Plaintiff did not know that Mark and Sid Nicholls' representations to them were false. Prior to that time, Plaintiff believed that Sid's and Mark's representations to them were true.

160. Plaintiff did, in fact, rely on Mark Nicholls' and Sid Nicholls' false representations and omissions of material fact in making his decision to purchase the securities set forth above.

161. Plaintiff's reliance on Mark Nicholls' and Sid Nicholls' false representations and omissions was reasonable. Plaintiff had no reason to doubt or disbelieve Mark Nicholls' and Sid Nicholls' representations at the time they were made.

162.     Plaintiff lost all or substantially all of his investment in TIH.

163.     Had Plaintiff known the truth, he would not have invested in TIH. Thus, Plaintiff's losses were proximately caused by Mark Nicholls' and Sid Nicholls' misrepresentations, omissions, and deceptive scheme and Sid Nicholls' direction of same.

164.     Mark and Sid Nicholls have profited unjustly as a result of their fraudulent misrepresentations, omissions, and deceptive scheme.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants Mark Nicholls and Sid Nicholls, jointly and severally, and enter an order:

A.     Awarding Plaintiff compensatory damages in an amount equal to the return of the consideration paid for the aforementioned securities less the value Plaintiff received on his investment, if any, in an amount to be proven at trial;

B.     Ordering disgorgement of all profits earned by Mark or Sid Nicholls in connection with his fraudulent misrepresentations, to the extent said profits exceed Plaintiff's losses and awarding those disgorged profits to Plaintiff, in an amount to be proven at trial;

C.     Awarding pre-judgment interest on all amounts awarded; and

D.     Providing for such other or further relief as is appropriate.

# COUNT II
## Violation of the Illinois Securities Law of 1953

165.     Plaintiff incorporates by reference paragraphs 1 through 145 above as though fully set forth herein.

166.     Mark and Sid Nicholls violated Section 12 of the Illinois Securities Law of 1953, 815 ILCS 5/12(F)-(G) & (I), in that they:

(a)     engaged in transactions, practices and a course of business in connection with the sale of securities which works or tends to work a fraud or deceit upon the purchaser thereof;

(b)     obtained money or property through the sale of securities by means of untrue statements of a material fact and omitted to states material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and

(c)     employed devices, schemes and artifice to defraud in connection with the sale of securities in TIH.

167.    Mark Nicholls made false representations of material fact to Plaintiff, as set forth in Paragraphs 37–145 of this Complaint.

168.    Mark Nicholls made these knowingly false representations of material fact with the willful and fraudulent intent to induce reliance on them and, by inducing that reliance, secure the investments described in Paragraph 17 of this Complaint.

169.    Sid Nicholls possesses the direct or indirect power to direct or cause the direction of management and policies of TIH, UBU Sports and his son, Mark Nicholls.

170.    Relative to TIH, UBU Sports and Mark Nicholls, Sid Nicholls was, at all relevant times, a controlling person.

171.    Sid Nicholls acted in concert with Mark Nicholls to make the knowingly false representations of material fact described in Paragraphs 37-145 of this Complaint.

172.    Sid Nicholls made false representations of material fact to Plaintiff, as set forth in Paragraphs 108-145 of this Complaint, by fabricating the Turf Nation Contract with the private understanding that it was not a valid contract between Turf Nation and UBU Sports and that it would, instead, be immediately terminated.

173. Sid Nicholls made the knowingly false representations of material fact embodied by the Turf Nation Contract with the willful and fraudulent intent to induce reliance on them and, by inducing that reliance, secure the investments described in Paragraph 17 of this Complaint.

174. As a Director and Chief Executive Officer of TIH, Mark Nicholls owed a fiduciary duty to Plaintiff.

175. Mark Nicholls concealed material facts in violation of those duties and the Illinois Securities Law by failing to disclose the truth of the facts referred to above as well as by concealing his receipt of Sid Nicholls' purported termination of the Turf Nation Contract.

176. The membership interests and notes described in Paragraph 17 of this Complaint constitute "securities" as defined in Section 2.1 of the Illinois Securities Law, 815 ILCS 5/2.1.

177. Mark and Sid Nicholls made these false representations and omissions of material fact in connection with the sale of securities, namely, the aforementioned membership interests and notes.

178. Until late 2016, Plaintiff did not know that Mark and Sid Nicholls' representations to him were false. Prior to that time, Plaintiff believed that Sid's and Mark's representations to him were true.

179. Plaintiff did, in fact, rely on Mark Nicholls' and Sid Nicholls' false representations and omissions of material fact in making his decision to purchase the securities set forth above.

180. Plaintiff's reliance on Mark Nicholls' and Sid Nicholls' false representations and omissions was reasonable. Plaintiff had no reason to doubt or disbelieve Mark Nicholls' and Sid Nicholls' representations at the time they were made.

181. Plaintiff lost all or substantially all of his investment in TIH.

182.    Had Plaintiff known the truth, he would not have invested in TIH. Thus, Plaintiff's losses were proximately caused by Mark Nicholls' and Sid Nicholls' misrepresentations, omissions, and deceptive scheme and Sid Nicholls' direction of same.

183.    Mark and Sid Nicholls have profited unjustly as a result of their fraudulent misrepresentations, omissions, and deceptive scheme.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants Mark Nicholls and Sid Nicholls, jointly and severally, and enter an order:

A.    Awarding Plaintiff the full amount paid, together with interest from the date of payment for the securities sold at the rate of the interest or dividend stipulated in the securities sold (or if no rate is stipulated, then at the rate of 10% per annum) less any income or other amounts received by the purchaser on the securities, upon offer to tender to the seller or tender into court of the securities sold, said amounts to be proved at trial;

B.    Awarding pre-judgment interest on all amounts awarded;

C.    Awarding costs and reasonable attorneys' fees; and

D.    Providing for such other or further relief as is appropriate.

# COUNT III

## Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO")

184.    Plaintiff incorporates by reference paragraphs 1 through 145 above as though fully set forth herein.

185.    Mark and Sid Nicholls violated Section 1962 of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, in that they:

(a)    Used or invested income derived from a pattern of racketeering activity in which they participated as a principal in the operation of an enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce;

(b)     Maintained an interest in or control of an enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce, through a pattern of racketeering activity;

(c)     Conducted and participated in the conduct of an enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce, through a pattern of racketeering activity; and

(d)     Conspired with one another to take the actions section forth in subsections (a) through (c) of this Paragraph.

186.    Since at least as early as 2003, Sid and Mark Nicholls have conducted the affairs an enterprise, namely, an association in fact consisting of, at all times and at a minimum, themselves, and including from time to time, other entities under the direct or indirect control of one or both of them (the "Enterprise").

187.    Beginning at least as early as 2003, this Enterprise has been engaged in the fraudulent offering and sale of securities. The Enterprise conducts its affairs through an interconnected group of corporate and other business entities through which Sid Nicholls and Mark Nicholls artificially boost the sale and profits of one entity — a manufacturer and supplier of artificial turf nominally owned and operated by Sid Nicholls — by using the funds invested in that supplier's principal customers — various turf installation companies nominally owned and controlled by Mark Nicholls — to purchase excessive amounts of artificial turf at above market rates and far in excess of the customers' ability to profitably pay.

188.    Once the investors' funds are nearly gone, the Enterprise, through Sid and Mark Nicholls and the various business entities under their control, sue the investors in order to sweep

up the customer-entities' remaining assets and force whatever additional funds they can from the customer-entities' investors.

189. The Enterprise then markets the turf supplier-entity at an artificially high valuation to an unsuspecting buyer.

190. By the time that buyer realizes that the supplier-entities' profits were built on an unsustainable pattern of sales to now-defunct, family-controlled customer-entities, the Nicholls Enterprise has taken the sales proceeds and begun the process again.

191. The violations of the Exchange Act set forth in Count I of this Complaint constitute racketeering activity as defined in Section 1961(1)(D) of RICO.

192. Plaintiff in this case is, only one of the more recent investors to be taken by the Nicholls family Enterprise. The Nichollses are repeating a pattern of conduct they first employed successfully nearly a decade ago, when Mark Nicholls used his prior company — Sportexe — to artificially inflate the valuation of Sid Nicholls' first turf manufacturing operation: TurfStore.com, Inc.

193. Sid and Mark Nicholls have conducted the affairs of the Enterprise through a pattern of fraud in the sale of securities dating back to at least 2003 when they artificially inflated the valuation of Turfstore.com, Inc., through a pattern of above-market-price sales to Sportexe beyond the ability of Sportexe to profitably pay, at the expense of Sportexe's investors.

194. The Nichollses have used and invested the income derived from the original Sportexe/Turfstore.com scheme in the operation of Turf Nation, Turf Industry Holdings and UBU Sports, as well the ongoing Enterprise by which they have defrauded Plaintiff and other investors, all of which are engaged in, or the activities of which affect, interstate or foreign commerce.

195. Sid and Mark Nicholls maintain their interest in and control of the Enterprise through acts of fraud in connection with the sale of securities.

196. Sid and Mark Nicholls conduct and participate in the conduct of the Enterprise through acts of fraud in connection with the sale of securities.

197. Mark and Sid Nicholls have conspired to commit the acts complained of in this Count.

198. Plaintiff lost all or substantially all of his investment in TIH.

199. But for the fraudulent actions of Sid and Mark Nicholls, Plaintiff would not have invested in TIH. Thus, Plaintiff's losses were proximately caused by Mark Nicholls' and Sid Nicholls' fraud in connection with the sale of securities.

200. Mark and Sid Nicholls have profited unjustly as a result of their fraudulent misrepresentations, omissions, and deceptive scheme.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendants Mark Nicholls, Sid Nicholls or both of them, jointly and severally, and enter an order:

A. Awarding Plaintiff threefold the compensatory damages resulting from the acts complained of in this Count, in an amount to be proven at trial;

B. Awarding pre-judgment interest on all amounts awarded; and

C. Awarding costs and reasonable attorneys' fees;

D. Providing for such other or further relief as is appropriate.

## COUNT IV

### Breach of Fiduciary Duty
### (against Mark Nicholls only)

201.    Plaintiff incorporates by reference paragraphs 1 through 145 above as though fully set forth herein.

202.    As a Director and Chief Executive Officer of TIH and as Chief Executive Officer of UBU Sports, Mark Nicholls owed a fiduciary duty to Plaintiff who had invested in TIH.

203.    Mark Nicholls owed the highest duty of honesty, good faith and fair dealing to Plaintiff who had invested in TIH.

204.    Mark Nicholls made false representations of material fact to Plaintiff, as set forth in Paragraphs 37–145 of this Complaint.

205.    Mark Nicholls made these knowingly false representations of material fact with the willful intent to induce reliance on them and, by inducing that reliance, secure the investments described in Paragraph 17 of this Complaint.

206.    Mark Nicholls willfully concealed material facts in violation of his fiduciary duties by failing to disclose the truth of the facts referred to above as well as by concealing his receipt of Sid Nicholls' purported termination of the Turf Nation Contract.

207.    Mark Nicholls made these material misrepresentations and omissions to Plaintiff after he first invested in TIH and, in particular, in connection with each of his subsequent investments in TIH.

208.     Plaintiff did, in fact, rely on Mark Nicholls' false representations and omissions of material fact in making his decision to make additional investments in TIH as well as to not revisit his prior decision with respect to his initial investment.

209.    Plaintiff lost all or substantially all of his investment in TIH.

210. Had Plaintiff known the truth, he would not have invested in TIH. Thus, Plaintiff's losses were proximately caused by Mark Nicholls' breaches of fiduciary duty.

211. Mark Nicholls has profited unjustly as a result of his fraudulent misrepresentations, omissions, and deceptive scheme.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendant Mark Nicholls and enter an order:

    A.    Awarding Plaintiff the compensatory damages resulting from the acts complained of in this Count, in an amount to be determined at trial;

    B.    Ordering disgorgement of all profits earned by Mark Nicholls in connection with his breaches of fiduciary duty, to the extent said profits exceed Plaintiff's losses and awarding those disgorged profits to Plaintiff, in an amount to be proven at trial;

    C.    Awarding punitive damages in an amount the Court deems appropriate.

    D.    Awarding pre-judgment interest on all amounts awarded; and

    E.    Providing for such other or further relief as is appropriate.

# COUNT V
## Conspiracy to Breach Fiduciary Duty

212. Plaintiff incorporates by reference paragraphs 1 through 145 above as though fully set forth herein.

213. Mark Nicholls and Sid Nicholls worked together to accomplish Mark Nicholls' breach of fiduciary duty as described in paragraphs 202-211.

214. Among other things, Mark and Sid Nicholls together made false representations of material fact to Plaintiff, as set forth in Paragraphs 108–145 of this Complaint, by fabricating the Turf Nation Contract with the private understanding that it was not a valid contract between Turf Nation and UBU Sports and that it would, instead, be immediately terminated.

215. Mark and Sid Nicholls together failed to timely disclose the termination of the Turf Nation Contract, thereby fraudulently inducing the Plaintiff's investment in TIH.

216. Sid Nicholls' knowing and intentional participation in the fabrication of the Turf Nation contract and its purported termination with Mark Nicholls induced the Plaintiff's reliance on false representations.

217. The objective of the conspiracy was to induce the Plaintiff's reliance on false representations in order to continue making investments in TIH.

218. Mark Nicholls and Sid Nicholls have profited unjustly as a result of these fraudulent misrepresentations, omissions, and deceptive scheme.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendant Mark Nicholls and enter an order:

A. Awarding Plaintiff the compensatory damages resulting from the acts complained of in this Count, in an amount to be determined at trial;

B. Ordering disgorgement of all profits earned by Mark Nicholls in connection with his breaches of fiduciary duty, to the extent said profits exceed Plaintiff's losses and awarding those disgorged profits to Plaintiff, in an amount to be proven at trial;

C. Order disgorgement of all compensation received by Mark Nicholls in exchange for performance of his duties as Director and Chief Executive Officer of TIH or UBU Sports from the time of his first breach of fiduciary duty and awarding that disgorged compensation to Plaintiff, in an amount to be proven at trial;

D. Awarding punitive damages in an amount the Court deems appropriate.

E. Awarding pre-judgment interest on all amounts awarded; and

F. Providing for such other or further relief as is appropriate.

## COUNT VI

### Breach of Contract
### (against Mark Nicholls Only)

219. Plaintiff incorporates by reference paragraphs 1 through 145 above as though fully set forth herein.

220. Mark Nicholls personally signed each of the May 2014 MIPA, the July 2014 MIPA, the September 2014 MIPA, the November 2014 MIPA and the April 2015 MIPA, twice: once in his personal capacity as "founder," and a second time as CEO of TIH.

221. In Section 4(f) of each MIPA, TIH represented and warranted that "[t]he Company [*i.e.*, TIH] has complied with all applicable laws (including rules, regulations, codes, injunctions, judgments, orders, decrees, rulings, and charges thereunder ...) of U.S. and Canadian federal, state, provincial and local governments (and all agencies thereof), including without limitation all such laws relating … the sales of securities …."

222. The representation made in Section 4(f) of each MIPA was false, because in fact the TIH marketing materials and statements by Mark Nicholls and Sid Nicholls contained material misrepresentations in violation of securities laws.

223. The Turf Nation Contract is defined as a "Material Contract" in Section 4(m) of each MIPA.

224. In Section 4(m) of each MIPA, TIH represented and warranted that "[a]ll of the Material Contracts are valid, binding and in full force and effect in all material respects …." TIH further represented and warranted, in that Section, that "[n]either the Company [*i.e.*, TIH] nor, to the Company's knowledge, is any other party to any Material Contract in material default under any of such Material Contract."

225. The representations made in Section 4(m) of each MIPA were false because Mark Nicholls was aware that the Turf Nation Contract was fabricated at the time the MIPA was signed.

226. In Section 4(p) of each MIPA, TIH represented and warranted that "the Company [*i.e.*, TIH] has provided the Buyers with all material information regarding the Company's business and operations, and no such material information contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained therein not misleading in light of the circumstances under which they were made."

227. The representations made in Section 4(p) were false, because Mark and Sid Nicholls failed to disclose to investors the nature of the relationship between UBU Sports and Turf Nation, along with misrepresentations spoken by Mark Nicholls regarding his personal experience and investment in TIH.

228. In Section 5(c) of each MIPA, Mark Nicholls personally represented and warranted that all of TIH's representations and warranties in Sections 4(f), (m) & (p) were true and complete.

229. In Section 5(b) of each MIPA, Mark Nicholls personally represented and warranted that "[t]here is no action, suit or proceeding, or governmental inquiry or investigation pending or, to Founder's [*i.e.,* Mark Nicholls'] Knowledge, threatened against Founder, and to Founder's Knowledge there is no basis for any such action, suit, proceeding, inquiry or investigation."

230. The representations made in Sections 5(b) & (c) of each MIPA were false, since Mark Nicholls knew that his misrepresentations formed the basis for an action for violations of the securities laws, among other regulations.

231. Mark Nicholls breached the representations and warranties made in Sections 5(b) & (c) of each MIPA by making material misrepresentations.

232. Mark Nicholls personally signed each of the Series B Note Purchase Agreement and Series C Note Purchase Agreement (collectively, the "Note Purchase Agreements") in his personal capacity as "founder" of TIH.

233. In Section 4(f) of each of the Note Purchase Agreements, TIH represented and warranted that "[t]he Company [*i.e.*, TIH] has complied with all applicable laws (including rules, regulations, codes, injunctions, judgments, orders, decrees, rulings, and charges thereunder ...) of U.S. and Canadian federal, state, provincial and local governments (and all agencies thereof), including without limitation all such laws relating … the sales of securities …."

234. The representation made in Section 4(f) of each of the Note Purchase Agreements was false, because in fact the TIH marketing materials and statements by Mark Nicholls and Sid Nicholls contained material misrepresentations in violation of the securities laws.

235. The Turf Nation Contract is defined as a "Material Contract" in Section 4(m) of each of the Note Purchase Agreements.

236. In Section 4(m) of each of the Note Purchase Agreements, TIH represented and warranted that "[a]ll of the Material Contracts are valid, binding and in full force and effect in all material respects …."  TIH further represented and warranted, in that Section, that "[n]either the Company [*i.e.*, TIH] nor, to the Company's knowledge, is any other party to any Material Contract in material default under any of such Material Contract."

237. The representations made in Section 4(m) of each of the Note Purchase Agreements were false because Mark Nicholls was aware that the Turf Nation Contract was fabricated at the time the MIPA was signed.

238.    In Section 4(p) of each of the Note Purchase Agreements, TIH represented and warranted that "the Company [*i.e.*, TIH] has provided the Buyers with all material information regarding the Company's business and operations, and no such material information contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained therein not misleading in light of the circumstances under which they were made."

239.    The representations made in Section 4(p) were false because Mark and Sid Nicholls failed to disclose to investors the nature of the relationship between UBU Sports and Turf Nation, along with misrepresentations spoken by Mark Nicholls regarding his personal experience and investment in TIH.

240.    In Section 5(c) of each of the Note Purchase Agreements, Mark Nicholls personally represented and warranted that all of TIH's representations and warranties in Sections 4(f), (m) & (p) were true and complete.

241.    In Section 5(b) of each of the Note Purchase Agreements, Mark Nicholls personally represented and warranted that "[t]here is no action, suit or proceeding, or governmental inquiry or investigation pending or, to Founder's [*i.e.,* Mark Nicholls'] Knowledge, threatened against Founder, and to Founder's Knowledge there is no basis for any such action, suit, proceeding, inquiry or investigation."

242.    The representations made in Sections 5(b) & (c) of each of the Note Purchase Agreements were false, since Mark Nicholls knew that his misrepresentations formed the basis for an action for violations of the securities laws, among other regulations.

243.    Mark Nicholls breached the representations and warranties made in Sections 5(b) & (c) of each of the Note Purchase Agreements.

244.     Plaintiff relied on Mark Nicholls' representations and warranties in making his decision to invest in TIH pursuant to the contracts described above.

245.     Plaintiff has substantially performed his obligations under the contracts described above and all condition precedents thereto have been satisfied.

246.     Plaintiff lost all or substantially all of his investment in TIH.

247.     Had Plaintiff known Mark Nicholls' representations were, in fact, false, he would not have invested in TIH. Thus, Plaintiff's losses were proximately caused by Mark Nicholls' breaches of warranty.

248.     Mark Nicholls has profited unjustly as a result of his fraudulent misrepresentations, omissions, and deceptive scheme.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendant Mark Nicholls and enter an order:

A.     Awarding Plaintiff the compensatory and consequential damages resulting from the acts complained of in this Count, in amounts to be determined at trial;

B.     Awarding punitive damages in an amount the Court deems appropriate;

C.     Awarding pre-judgment interest on all amounts awarded; and

D.     Providing for such other or further relief as is appropriate.

## COUNT VII
## Common Law Fraud

249.     Plaintiff incorporates by reference paragraphs 1 through 145 above as though fully set forth herein.

250.     Mark Nicholls made false representations of material fact to Plaintiff, as set forth in Paragraphs 37–145 of this Complaint.

251.    Mark Nicholls made these knowingly false representations of material fact with the willful and fraudulent intent to induce reliance on them and, by inducing that reliance, secure the investments described in Paragraph 17 of this Complaint.

252.    Sid Nicholls made false representations of material fact to Plaintiff, as set forth in Paragraphs 108–145 of this Complaint, by fabricating the Turf Nation Contract with the private understanding that it was not a valid contract between Turf Nation and UBU Sports and that it would, instead, be immediately terminated.

253.    Sid Nicholls made the knowingly false representations of material fact embodied by the Turf Nation Contract with the willful and fraudulent intent to induce reliance on them and, by inducing that reliance, secure the investments described in Paragraph 17 of this Complaint.

254.    Until late 2016, Plaintiff did not know that Mark and Sid Nicholls' representations to them were false. Prior to that time, Plaintiff believed that Sid's and Mark's representations to him were true.

255.    Plaintiff did, in fact, rely on Mark Nicholls' and Sid Nicholls' false representations of material fact in making his decision to make the investments described above.

256.    Plaintiff's reliance on Mark Nicholls' and Sid Nicholls' false representations was reasonable. Plaintiff had no reason to doubt or disbelieve Mark Nicholls' and Sid Nicholls' representations at the time they were made.

257.    Defendants' lies were not made or accepted casually or carelessly, but rather took place within the context of formal arm's length due diligence processes.

258.    Plaintiff lost all or substantially all of his investment in TIH.

259.     Had Plaintiff known the truth, he would not have invested in TIH. Thus, Plaintiff's losses were proximately caused by Mark Nicholls' and Sid Nicholls' misrepresentations, omissions, and deceptive scheme and Sid Nicholls' direction of same.

260.     Mark and Sid Nicholls have profited unjustly as a result of their fraudulent misrepresentations.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants Mark Nicholls and Sid Nicholls, jointly and severally, and enter an order:

A.  Awarding Plaintiff compensatory damages resulting from the acts complained of in this Count, in amounts to be determined at trial;

B.  Awarding punitive damages in an amount the Court deems appropriate;

C.  Awarding pre-judgment interest on all amounts awarded; and

D.  Providing for such other or further relief as is appropriate.

# COUNT VIII
## Conspiracy to Defraud

261.     Plaintiff incorporates by reference paragraphs 1 through 145 above as though fully set forth herein.

262.     Mark Nicholls and Sid Nicholls worked together to accomplish the fraud as described in paragraphs 250-261.

263.     Mark and Sid Nicholls conspired to make false representations of material fact to Plaintiff, as set forth in Paragraphs 108–145 of this Complaint, by fabricating the Turf Nation Contract with the private understanding that it was not a valid contract between Turf Nation and UBU Sports and that it would, instead, be immediately terminated.

264.     Mark and Sid Nicholls together failed to timely disclose the termination of the Turf Nation Contract, thereby fraudulently inducing the Plaintiff's investments in TIH.

265.     Sid Nicholls' knowing and intentional participation in the fabrication of the Turf Nation contract and its purported termination with Mark Nicholls induced the Plaintiff's reliance on false representations.

266.     The objective of Mark and Sid Nicholls' conspiracy was to induce the Plaintiff's reliance on false representations in order to continue making investments in TIH.

267.     Mark Nicholls and Sid Nicholls have profited unjustly as a result of these fraudulent misrepresentations, omissions, and deceptive scheme.

268.     Plaintiff did, in fact, rely on Mark Nicholls' and Sid Nicholls' false representations of material fact in making his decision to make the investments described above.

269.     Plaintiff lost all or substantially all of his investment in TIH.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants Mark Nicholls and Sid Nicholls, jointly and severally, and enter an order:

A.  Awarding Plaintiff compensatory damages resulting from the acts complained of in this Count, in amounts to be determined at trial;

B.  Awarding punitive damages in an amount the Court deems appropriate;

C.  Awarding pre-judgment interest on all amounts awarded; and

D.  Providing for such other or further relief as is appropriate.


**JURY DEMAND**

Plaintiff hereby demands a jury on all causes of action so triable.

Respectfully Submitted,
DAVID DIAMOND


By:    */s/ Monte L. Mann*
        One of His Attorneys

Monte L. Mann
Lally A. Gartel
NOVACK AND MACEY LLP
100 North Riverside Plaza
Chicago, IL 60606
Tel: 312-419-6900
Fax: 312-419-6928
*mmann@novackmacey.com*
*lgartel@novackmacey.com*
#918138