**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DAVID DIAMOND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: 17-cv-3900 |
| v. | ) | |
| | ) | |
| MARK NICHOLLS & SID NICHOLLS, | ) | Hon. Judge Bucklo |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| MARK NICHOLLS | ) | |
| | ) | |
| Counter-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID DIAMOND, | ) | |
| | ) | |
| Counter-Defendant. | ) | |

**Counterclaim**

Defendant/Counter-Plaintiff, Mark Nicholls ("Mark"), individually and derivatively on behalf of UBU Sports, Inc. ("UBU"), for his Counterclaim against Plaintiff/Counter-Defendant, David Diamond ("Diamond"), and in support thereof, states as follows:

**Introduction**

1. Motivated by greed and jealousy, Diamond engaged in a campaign of fraud, defamation, and disparagement against Mark to serve his own agenda and to the detriment of UBU. Ultimately, Diamond caused Mark to be terminated. Diamond and his allies made multiple attempts to provide a reason for Mark's termination, but each proved false. As a last-

ditch effort to justify his bad acts, Diamond concocted a supposed conspiracy between Mark and his father.

2. After Mark was wrongfully forced out of his position as CEO of UBU, Mark sued his former company for the right to compete in the artificial turf industry, among other issues, in a lawsuit captioned *Nicholls v. Diamond, et al.*, No. 16 CH 1721, in the Circuit Court of the Eighteenth Judicial Circuit, DuPage County, Illinois, Chancery Division ("DuPage litigation"). After filing a motion for partial summary judgment attacking the purported restrictive covenant, that portion of his case settled and it was confirmed that Mark has the right to compete.

3. Upon resolving the right to compete through the DuPage litigation, Turf Alliance became an authorized dealer for Turf Nation, Inc. ("Turf Nation"), which is operated by Mark's father, Sid Nicholls ("Sid"). Mark has been the CEO of Turf Alliance, Inc. ("Turf Alliance"), which he founded, since 2008.

4. Diamond and other insiders at UBU, however, maliciously acted to devastate Mark's ability to compete and earn a living. Diamond previously spread false statements about Mark, tortiously interfered with his negotiations for several high-profile contracts for the sale and installation of artificial turf, and damaged Mark's relationships with potential investors, with Diamond's false pleading in this action simply being the latest step intended to attack and undermine Mark's credibility in the industry. The primary purpose and motivation for the Delaware

2

litigation and this suit was to allow Diamond and his allies to circulate the baseless pleadings in the industry along with a press release to tarnish Mark's reputation.

5. Many of the representations Diamond alleges in his complaint were actually acts by Diamond. Diamond's primary responsibility with UBU and its affiliated companies was to raise capital. Diamond, as a lawyer experienced with start-ups, venture capital, and financing, carefully reviewed all due diligence materials for UBU. His law firm, Pedersen & Houpt, prepared or reviewed investment materials and assisted in marketing the company to potential investors. Diamond's wife, a certified financial analyst, also reviewed all due diligence materials before the Diamonds committed any capital.

6. Diamond routinely utilized corporate money and resources for his personal use, including but not limited to, submitting expense reports for "meetings" with "clients" and engaging in various non-work-related activities while he was purportedly soliciting potential investors, which was his primary assigned duty.

7. Diamond's lawsuit is merely a smoke screen by Diamond to distract customers and investors from his wrongful acts.

**Parties**

8. Diamond is a resident and citizen of Illinois. Diamond joined Pedersen & Houpt, LLC ("P&H") as an attorney in its corporate and business counseling group in January 2012 where he focused on, among

3

other areas, private equity and venture capital, closely-held business, and banking and financing. Prior to joining P&H, Diamond served as general counsel of a broker-dealer where he focused, in part, on compliance.

9. Mark is a resident of the Canadian Province of Ontario.

10. In 2008, Mark founded Turf Industry, Inc. Around the same time, Mark also founded UBU, Turfscape, Inc., and Outfill, Inc. The principal business of the related companies to the sale of synthetic turf surfaces for sports fields and facilities. Turf Industry, Inc., UBU, Turfscape, Inc., and Outfill, Inc. are collectively referred to as the Turf Companies.

11. In 2013, Mark organized Turf Industry Holdings, LLC ("TIH") to be the parent company for the Turf Companies. During the relevant period to this lawsuit, commencing in January 2014 and ending with his termination in October 2016, Mark, through a separate entity, was a shareholder in TIH.

12. UBU is a Delaware corporation with its principal place of business in Chicago, Illinois. Mark served as CEO of UBU until his wrongful termination in October 2016.

**Demand Futility**

13. A demand upon Act Global, LLC's board of directors to sue Diamond would be futile. Act acquired UBU in a fire sale either masterminded by Diamond or accomplished with his active cooperation. To the extent that TIH and UBU remain operational, Diamond is, upon

4

information and belief, now a director with substantial influence over Act's board.  Mark has been sued in Delaware by UBU and has sued TIH and many of its individual investors/directors in DuPage County.  The Delaware litigation includes substantially similar claims to those alleged by Diamond in this action.  Act Global could not file a bona fide lawsuit against Diamond here without alienating one of its necessary witnesses for its bogus Delaware action or supporting the claims made by Mark, its/their opponent in the DuPage litigation.

**Facts**

14. In late 2013, Mark brought Joseph Vrankin ("Vrankin") on board as President and Chief Financial Officer of UBU and the Turf Companies. Vrankin previously served as the Chief Executive Officer of TopGolf International, Inc. and the Chief Operating Officer and Chief Financial Officer for the Arena Football League.

15. In October 2013, before Vrankin accepted the position, Mark sent Vrankin two 5-inch binders containing due diligence materials on UBU, which included its corporate governance documents, income statements, balance sheets, and financial disclosures and projections, and contracts. Mark informed Vrankin of, among other issues, the large balance on UBU's accounts payable, including to Turf Nation, which he identified as being owned and controlled by his father.

16. In October 2013, Mark informed Vrankin that "the raise [of capital] will be your first and primary priority." Mark and Vrankin

5

discussed and agreed that Vrankin would assume responsibility for all aspects of the business financially, including but not limited to raising capital, managing cash flow, implementing internal controls, and approving expense reports.

17. Vrankin signed an employment contract effective January 1, 2014 to serve as President and CFO of the Turf Companies.

18. Diamond became involved with TIH and the Turf Companies as an attorney at Pedersen & Houpt, LLC ("P&H") in January 2014, at Vrankin's recommendation. P&H served as counsel to TIH for the Series A Membership Offering in March 2014 at Vrankin's request. Diamond and P&H led the effort in promoting the TIH offering and soliciting potential investors. As part of this, they vetted the promotional materials.

19. Diamond is an accredited investor. He relied upon his own analyses as an attorney, as well as those of his colleagues at P&H, professionals in the financial sector, and his wife, a certified financial analyst and a managing director for the Northwestern University Endowment Fund, before deciding to invest.

20. Diamond emailed potential investors that "[t]here is a lot of information to digest, but based on the evaluations of around 10 investment banking firms/broker dealers, funds and family offices we visited with in NY and Boston the past two days, there seems to be significant interest in the opportunity." Diamond asked two individuals he described as "seasoned Venture Capital professionals" to schedule a

6

meeting and further stated that "Amy [Diamond's wife] suggested that I reach out to you after she reviewed the deck this weekend."

21. On May 5, 2014, after months of work investigating, vetting, and promoting TIH, based upon his independent knowledge, and the knowledge of his wife and colleagues at P&H, the Diamonds also became an investor in TIH and the Turf Companies by participating in the Series A Membership Offering.

22. After his initial investment, Diamond continued to lead the efforts to raise capital for TIH and the Turf Companies, along with Vrankin, Diamond's wife, and Susan Burke, another attorney at P&H. Diamond's position with the Turf Companies was eventually formalized as the "Director of Business Development."

23. Vrankin and Diamond took the primary role in fundraising, with Mark only participating at their request and after sufficient interest had been generated. For example, on October 9, 2014, in an email to Darryl Cheeks at Black Rhino Financial Group, Inc., Vrankin, copying Diamond, stated "Mark is focused on other aspects of our business and will not be part of the call."

24. Diamond also instructed Mark to limit his "spiel" and to omit select details regarding his history with Sportexe because they were irrelevant.

25. As Director of Business Development, Diamond traveled around the country promoting UBU to potential investors in an attempt to raise

7

capital for the company. Diamond also worked to promote the other Turf Companies, including Turfscape. To do so, he incurred expenses for airfare, hotels, meals, and entertaining potential investors.

26. Following his trips, Diamond submitted large expense reimbursement requests. His requests were reviewed and approved at the time by Vrankin. Examining Diamond's requests now, they are vague and lack specifics regarding the exact nature of his expenditures, who was present, and how they were related to company business. They failed to include supporting documents such as receipts. These expenses include those incurred on trips to New Orleans, Los Angeles, Las Vegas, and New York, among others.

27. Upon information and belief, Diamond was seeking reimbursement for inappropriate "personal" expenses, including non-work related "entertainment." TIH's CFO, Vrankin approved these expenses. The true nature of Diamond's activities while traveling as a representative of TIH was communicated to Mark after the fact by others who were present for and witnessed Diamond's behavior.

28. Mark and Vrankin confronted Diamond in New Orleans in early December 2014 regarding the propriety of his expenses, including the establishments he was frequenting and the individuals who accompanied him, and attempted to put a stop to his waste of corporate assets and time. Not only was Mark concerned for Diamond personally, but he also

believed Diamond's behavior would reflect poorly on the Turf Companies and deter potential investors.

29. In January 2015, Vrankin emailed Mark questioning "expenses" incurred by Diamond after UBU's controller, Bryan Harej, flagged the expenditures. Diamond told Mark that he had over $100,000 in unreimbursed expenses.

30. Diamond confided in Mark regarding his marriage during conversations they had about his behavior in New Orleans and used these conversations to pressure Mark for more ownership in TIH and the Turf Companies. In an email dated November 14, 2014, he stated "that we [UBU] are at $4M in equity raised through my contacts."

31. Before the confrontation, Diamond expressed his respect for Mark and his ability to run the company, stating "in no way could anyone but you run this business."

32. Prior to mid-2016, Turf Industry, Inc. owed substantial amounts to Turf Nation for turf ordered by and delivered to Turf Industry, Inc. Sid, owner of Turf Nation, repeatedly requested payment, typically by contacting Bryan Harej (the controller) or Vrankin. In response to many of Sid's requests for payment, Vrankin or Diamond attempted to exploit Mark's relationship with Sid by asking Mark to reassure Sid and to secure Turf Industry, Inc. more time to pay.

33. Beginning in April 2015, UBU began buying turf from Turf Nation and, similar to Turf Industry, Inc., ran up a large balance owed to Turf

9

Nation and failed to pay. When Sid repeatedly requested payment, Vrankin and Diamond again sought to exploit Mark's relationship by directing him to ask Sid to allow UBU or Turf Industry, Inc. to delay payment. Vrankin and Diamond knew that they did not have a line of credit with Turf Nation, and struggled when invoices came due and they did not have the money demanded when it was required/demanded.

34. Upon their requests, Mark talked to Sid and asked for more time for Turf Industry, Inc. or UBU to pay the amounts owed. Vrankin was the individual primarily responsible for payment on Turf Industry, Inc.'s and UBU's accounts.

35. On or about May 18, 2015, TIH obtained a commitment from an outside firm, Alturus Capital ("Alturus") to invest up to $6 million in TIH. Partnering with Alturus in 2015 was in the best financial interest of TIH as it would have provided TIH with capital on favorable terms, would have permitted TIH to pay off some or all of its debts, and would have given TIH the financial flexibility and the capital it needed to grow into a profitable venture.

36. The Alturus deal, however, was killed by another UBU director, Logan Powell, who served as the representative for Copper Beech Capital, Ltd. ("Copper Beech"). Upon information and belief, the Alturus deal was killed to benefit Copper Beech and to reduce Mark's control over the Turf Companies.

37. After killing the Alturus deal, Copper Beech arranged for the Mitchell Trust to loan $4 million to TIH, thereby giving Copper Beech more control over TIH and the Turf Companies, making further capital raises a challenge.

38. In November 2015, the board of directors, as stated by Director Logan Powell, decided that "Mark is going to focus all of his time on UBU sports field sales (direct selling, managing/training the sales staff, etc.). All other functions (operations, finance, Turfscape, Outfill, etc.) will ultimately report to Joe."

39. Thereafter, Diamond conspired with Powell and Vrankin to set Mark up for removal from his position as CEO and exclusion from the market. In early 2016, Powell, Diamond, and Vrankin encouraged Mark to agree to another capital raise. The intent and result was a structure that further diminished Mark's control over the Turf Companies by purportedly diluting his ownership interest.

40. Specifically, it was proposed that TIH raise money based on a depressed valuation ($15 million instead of $25 million), with the resulting dilution coming from Mark's ownership.

41. Mark opposed this capital raise in early 2016, believing it was not in TIH's best interest.

42. Around the same time, Mark was granted an exclusive option to buy out TIH's investors, including Diamond. The option extended through September 20, 2016. As part of his option, Mark was permitted

11

to market the Turf Companies and Turf Nation as part of a single transaction. During this time, TIH would not seek additional outside funding or transactions.

43. During August 2016, Diamond and Vrankin traveled to Georgia to meet with a potential buyer for the company, Act Global Holdings, LLC ("Act Global"). Diamond negotiated with Act Global despite Mark's exclusive option and in violation of it. In doing so, Diamond acted with the specific intent to usurp Mark's control and takeover the Turf Companies.

44. As Mark's option expired, he proposed to the board that they take TIH public. Mark had generated interest in doing so from National Securities and Beacon. The board refused to even hear Mark's proposal, dismissing it immediately. Upon information and belief, Diamond had already turned the board against Mark and, with Vrankin and Powell, decided to pursue Act Global regardless of Mark's exclusive option or TIH's best interests.

45. By October 2016, Diamond's scheme, months in the making, finally came to a head. Vrankin and Diamond forced Mark out. Shortly before Mark's termination, all employees that remained loyal to Mark were terminated.

46. Diamond circulated an email to all investors on October 28, 2016. He stated that Mark was being terminated for cause and would no longer serve in any role at the Turf Companies. No explanation, however, was

given. In subsequent communications with Mark, Vrankin, Susan Burke, and Diamond asserted three different reasons for Mark's termination but all proved to be false.

47. At the time of his termination, TIH also asserted a purported restrictive covenant to prevent Mark from competing.

48. Shortly after forcing Mark out, on December 2, 2016, TIH entered into a transaction to transfer the majority of its assets to Act Global. The transaction, on its surface, appeared to be less than arm's length, as TIH received an insubstantial sum for essentially all of its assets. Upon information and belief, Mark was terminated because Diamond and his allies feared Mark's opposition to the Act Global transaction.

49. The transaction, though, was pushed through on Diamond's efforts based on his desire for more power and more money. Upon information and belief, Diamond is currently employed by Act Global, has an ownership stake in Act Global, and profited from the Act Global transaction. Upon information and belief, Mark was terminated shortly before the Act Global transaction because Diamond and others stood to benefit personally from the deal.

50. Upon information and belief, Diamond was one of the masterminds behind the Act Global transaction, beginning negotiations as early as August 2016.

51. On December 2, 2016, Diamond emailed all shareholders of TIH to inform them of the Act Global transaction.

52. Following his termination, Mark repeatedly requested documents from Diamond regarding the Act Global transaction to be shared with the remaining shareholders to evaluate the transaction.

53. In response, on December 8, 2016, Diamond responded to Nicholls' request for information about Act Global, copying certain investors, in which Diamond, for the first time, accused Mark of making various misrepresentations regarding his prior experience and his capital contribution to TIH. In doing so, Diamond conveniently omitted that he led the fundraising efforts on behalf of TIH, that his law firm represented TIH in each raise, and that he routinely acted to undermine Mark and against TIH's bests interests.

54. Mark opposed the Act Global transaction because the value offered was insufficient. Mark filed the DuPage litigation to, among other purposes, oppose the Act Global transaction, to establish that the restrictive covenant purportedly preventing him from competing with the Turf Companies would not be asserted against him, and to seek damages related to his wrongful termination.

55. On or around January 19, 2017, Mark filed a motion for partial summary judgment regarding the enforceability of the restrictive covenant. Before the motion could ever be heard, though, TIH agreed to release Mark from any potential obligations thereunder. As a result, Mark was free to compete.

14

56. Upon resolving the issues related to the restrictive covenant in early 2017 pursuant to the DuPage litigation, Turf Alliance, which is owned by Mark, became an authorized dealer with Turf Nation for the purposes of selling Turf Nation's product directly to stadiums and facilities.

57. On or around February 15, 2017, Diamond texted the attorney for Maumee Bay Turf Center, which is a sports field contractor, falsely asserting that Mark caused a $20 million loss to UBU, that Mark operated a Ponzi scheme, and that Mark was the equivalent of Bernie Madoff, stating in reference to Mark, "I guess even Bernie Madoff still has a few friends. Too bad that Brad feels the obligation to honor Madoff and sons."

58. Upon information and belief, Diamond spread similar defamatory misrepresentations about Mark to certain high-profile clients in the artificial turf industry with whom Diamond knew Mark was negotiating.

59. Diamond's efforts represented a revival of his past scheme to thwart Mark in raising capital to buy out the investors pursuant to his exclusive option and continued Diamond's persistence in destroying Mark personally and professionally.

60. For example, Mark was told that he had the contract for the field at the Superdome in New Orleans but, after defamatory comments originating from Diamond to decision makers for the

Superdome, the deal fell apart. Adding insult to injury, Act Global – Diamond's new company – obtained the contract.

61. Similarly, Mark was told he had a contract with the University of Missouri. He, however, lost the contract after decision makers learned of the false stories being spread by Diamond throughout the industry.

62. SSC, which manages several college campuses, including all campuses for Texas A&M, would not allow Mark to bid on a project for Tarleton Stadium because of the false perception generated by Diamond's lies.

63. Mark was initially invited to bid for a contract with NRG Stadium in Houston but, upon hearing the lies generated by Diamond, NRG refused to do business with Mark.

64. Representatives from MetLife Stadium in New Jersey would not even engage Mark in negotiations based upon the lies circulating in the industry.

65. The defamatory falsehoods spread by Diamond also prevented Mark from engaging in negotiations with SMG generally, which manages more than eighty facilities, including the Superdome and NRG. Prior to Diamond defaming Mark, securing a contract with SMG was likely.

66. For each of the above, Mark likely would have obtained a contract but for interference by Diamond directly or indirectly.

16

Diamond's interference includes, upon information and belief, making false statements that Mark could not be trusted, that Mark is a crook, that Mark and his father have cheated many out of millions, that Mark is a liar, and many more.

67. Diamond has also tarnished Mark's reputation with investors in the artificial turf industry. In addition to sending an email to all TIH investors accusing Mark of running TIH into the ground and being incompetent, as well as sending text messages in which Mark is equated to Bernie Madoff, Diamond, upon information and belief, sent similar communications to other potential investors to prevent Mark from raising capital.

68. After Mark's wrongful termination, Diamond acted to prevent Mark from raising capital to limit Mark's ability to compete with ACT Global and within the industry he has spent his entire career.

69. For example, the National Interscholastic Athletic Administrators Association ("NIAAA") suspended Mark from speaking engagements. The NIAAA is a national association that brings together athletic administrators and, in part, focuses on sports turf safety. SMG uninvited Mark and his company from its annual conference. Prior to Diamond's lies, Mark regularly participated in both.

70. Finally, Diamond threatened former UBU employees that were pursuing employment with Mark's current company, Turf Alliance, to further limit Mark's ability to compete in the industry.

**Count I – Breach of Fiduciary Duty (Derivative)**

71. Mark incorporates paragraphs 1 through 70 as though fully set forth herein.

72. At all relevant times, UBU was a wholly-owned subsidiary of TIH. TIH is a closely held company with a limited number of shareholders.

73. In or around May 2014, Diamond became a shareholder in TIH. As a shareholder in a closely held company, Diamond owed fiduciary duties of loyalty, fairness, and good faith to the company and to all other shareholders.

74. Diamond breached his fiduciary duties to TIH and the Turf Companies, including UBU, by engaging in inappropriate conduct on business trips, including but not limited to trips in New Orleans, New York, Las Vegas, and Los Angeles.

75. Diamond's conduct, including certain individuals with whom he associated and certain venues he frequented while on company time, reflected poorly on TIH and the Turf Companies and interfered with its ability to attract new investors.

76. Furthermore, Diamond breached his fiduciary duties to TIH and the Turf Companies, including UBU, by expensing the

aforementioned inappropriate, non-business-related activities to TIH and the Turf Companies. As a result, Diamond misappropriated company assets for his own personal use

77. Upon learning of Diamond's misconduct, Mark attempted to intervene and prevent Diamond from engaging in the aforementioned conduct or, at the least, refrain from such conduct while acting as a representative for TIH and the Turf Companies.

78. As a direct and proximate result of Diamond's various breaches, TIH and the Turf Companies suffered damages in an amount to be determined at trial.

79. Based upon Mark's knowledge of Diamond's conduct, Diamond acted to purposefully force Mark out of the company.

WHEREFORE, Defendant/Counter-Plaintiff, Mark Nicholls, derivatively on behalf of Turf Industry Holdings, LLC, respectfully requests this Honorable Court enter judgment in its favor and against Plaintiff/Counter-Defendant, David Diamond, and award damages in an amount to be determined at trial, including punitive damages, and provide such other relief as the Court deems proper under the circumstances.

**Count II – Breach of Fiduciary Duty (Direct)**

80. Mark incorporates paragraph 1 through 70 as though fully set forth herein.

19

81. At all relevant times, UBU was a wholly-owned subsidiary of Turf Industry, Inc., which was owned TIH. TIH is a closely held company with a limited number of shareholders.

82. In or around May 2014, Diamond became a shareholder in TIH. As a shareholder in a closely held company, Diamond owed fiduciary duties of loyalty, fairness, and good faith to the company and to all other shareholders.

83. Diamond breached his fiduciary duties to Mark by actively pursuing the Act Global transaction during the period in which Mark held an exclusive option to market TIH and the Turf Companies. Diamond's actions were a conscious effort to interfere with Mark's exclusive option.

84. Diamond further breached his fiduciary duties to Mark by actively campaigning against him to the other investors and undermined Mark's position with the board, management, and employees.

85. As a direct and proximate result of the aforementioned breaches, Diamond successfully convinced the board to terminate Mark without just cause.

86. Mark suffered personal injuries, distinct from any other shareholder as a result of Diamond's breaches. Specifically, Mark was denied the opportunity to exercise his exclusive option and

regain control over his companies and was wrongfully terminated from his position as CEO.

87. As a direct and proximate result of the aforementioned breaches, Mark suffered damages in an amount to be determined at trial.

WHEREFORE, Defendant/Counter-Plaintiff, Mark Nicholls, respectfully requests this Honorable Court enter judgment in his favor and against Plaintiff/Counter-Defendant, David Diamond, and award damages in an amount to be determined at trial, including punitive damages, and provide such other relief as the Court deems proper under the circumstances.

**Count III – Defamation Per Se (Direct)**

88. Mark incorporates paragraphs 1 through 70 as though fully set forth herein.

89. Beginning in Summer 2016 and continuing throughout 2017, Diamond disseminated false statements about Mark to potential customers, industry relationships, and investors.

90. These statements impugned Mark's integrity by, among other reasons, imputing the commission of a criminal offense, imputing a want of integrity in the discharge of the duties of his employment, and imputing a lack of ability in his trade, profession, or business.

91. For example, Diamond sent a text message to the attorney for another company in the industry comparing Mark to Bernie

Madoff, claiming he ran a Ponzi scheme and caused investors to lose $20 million.

92. Upon information and belief, Diamond made similar statements to other investors, suggesting that Mark could not be trusted with their money and steals investor funds for his own benefit.

93. In addition to the above, Diamond lied to customers in the industry, beginning in Spring 2017 after Mark resolved his right to compete and continuing to present, stating that Mark ran UBU into the ground, did not honor his obligations, defrauded investors, and misappropriated corporate assets for his personal benefit. Upon information and belief, customers contacted, either directly or indirectly, include MetLife Stadium, NRG Stadium, the Superdome, University of Missouri, SSC, and SMG.

94. Diamond knew the statements he made were false and communicated them to third-parties for the sole purpose of damaging Mark's reputation in the industry and preventing him from competing with UBU and Act Global. He further knew that once he made slanderous statements to a small group of individuals in the industry, the lies would spread organically throughout the entire industry. Diamond acted out of malice towards Mark based upon Mark's knowledge of Diamond's inappropriate behavior on business trips and Mark's confrontation of him.

95. As a direct and proximate result of Diamond's false statements, Mark suffered damages in an amount to be established at trial.

WHEREFORE, Defendant/Counter-Plaintiff, Mark Nicholls, respectfully requests this Honorable Court enter judgment in his favor and against Plaintiff/Counter-Defendant, David Diamond, and award damages in an amount to be determined at trial, including punitive damages, and provide such other relief as the Court deems proper under the circumstances.

**Count IV – Tortious Interference (Direct)**

96. Mark incorporates paragraphs 1 through 70 as though fully set forth herein.

97. Mark founded TIH and the Turf Companies based on his substantial experience in the artificial turf business.

98. Mark took charge of sales for the Turf Companies, building relationships with several high-profile members of the industry, including various NFL teams.

99. On or about October 28, 2016, Mark was wrongfully terminated from his position as CEO of TIH and the Turf Companies.

100. In the ensuing litigation, Mark resolved his right to compete with the Turf Companies. As a result, Turf Alliance, another company operated by Mark, became an authorized dealer for Turf

23

Nation for the purpose of selling Turf Nation's product directly to stadiums and venues.

101. Mark was primarily responsible for Turf Alliance's efforts and he stood to personally benefit from any contracts generated by his efforts with Turf Alliance. Diamond acted specifically to impugn Mark's integrity and to destroy his reputation in the industry, thereby limiting his ability to compete regardless of which company he acted under.

102. In performing his duties as an authorized dealer for Turf Nation, Mark contacted many of his high-profile connections in the industry. Specifically, he began negotiating or attempting to negotiate for contracts with the Superdome, NRG Stadium, MetLife Stadium, University of Missouri, SMG, and SSC, among others.

103. Over the years, Mark developed strong working relationships with each of the aforementioned stadiums, venues, or management companies and reasonably believed that he would receive the contracts.

104. In or around Spring 2017, however, discussions suddenly and unexpectedly cooled. Around the same time, Mark learned that Diamond was spreading lies about him to potential customers and industry members. UBU, with whom Diamond is affiliated, also filed suit against Mark in Delaware alleging that he misappropriated corporate assets for the benefit of Turf Nation. To do so, Diamond

24

repeatedly emphasized the "father-son conspiracy," despite Mark providing full disclosure of his relationship to Diamond and other investors at the outset. Upon information and belief, the suit in Delaware was filed for public relations purposes – to make potential customers and investors wary of doing business with Mark and Turf Nation. UBU, including Diamond, circulated a copy of the complaint throughout the industry, along with other false statements regarding Mark, including to the aforementioned potential customers.

105. Upon hearing Diamond's disparaging comments and seeing the baseless allegations in the Delaware litigation, the aforementioned potential customers refused to do business with Mark. Had Diamond not defamed Mark and not filed a baseless lawsuit for the purpose of damaging Mark's reputation, Mark reasonably expected to receive the contracts with the previously identified stadiums, venues, or management companies.

106. In addition to the above, Diamond's efforts almost cost Mark the contract with the NFL Hall of Fame. However, through additional efforts and much reassurance, Mark managed to maintain that contract.

107. As a direct and proximate result of Diamond's actions, Mark lost substantial contracts with several high-profile customers, including but not limited to those named herein, incurred unnecessary expenses to repair or attempt to repair his reputation

and maintain certain contracts, and has suffered reputational harm thereby preventing him from obtaining additional contracts in the future.

**Jury Demand**

108. Mark demands a trial by jury on all claims so triable.

WHEREFORE, Defendant/Counter-Plaintiff, Mark Nicholls, respectfully requests this Honorable Court enter judgment in his favor and against Plaintiff/Counter-Defendant, David Diamond, and award damages in an amount to be determined at trial, including punitive damages, and provide such other relief as the Court deems proper under the circumstances.

Respectfully submitted,

/s/Peter J. Evans
Thomas E. Patterson
Peter J. Evans
Patterson Law Firm, LLC
One North LaSalle Street
Suite 2100
Chicago, IL 60602
Tel.  312-223-1699
Fax. 312-223-8549
tpatterson@pattersonlawfirm.com
pevans@pattersonlawfirm.com

*Attorneys for Defendant/Counter-Plaintiff Mark Nicholls*