## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**DAVID DIAMOND,**

**Plaintiff,**

**v.**

**SID NICHOLLS,**

**Defendant**.

Case No. 17 cv 03900

Judge Mary M. Rowland

## MEMORANDUM OPINION & ORDER

This case arises from an investment and business venture gone awry. Plaintiff David Diamond asserts five claims against Sid Nicholls: (1) a claim under the Illinois Securities Law of 1953, 815 ILCS 5/13; (2) conspiracy to breach fiduciary duty; (3) aiding and abetting breach of fiduciary duty; (4) common law fraud; and (5) conspiracy to defraud. Before the Court is Sid Nicholls's motion for summary judgment (Dkt. 133) and corresponding motion for sanctions under Rule 11 (Dkt. 141). For the reasons set forth below, Sid Nicholls's summary judgment motion is granted [133], and his motion for sanctions [141] is denied.

## BACKGROUND

### 1. Facts Relevant for Summary Judgment

Sid Nicholls is the father of Mark Nicholls. In 2008, Mark Nicholls formed several companies to sell and install synthetic turf surfaces for sports fields and stadiums. (Dkt. 158, ¶ 69).[1] These companies were: (1) Turf Industry, Inc. ("Turf

---

[1] The following background material comes from Defendant's Local Rule 56.1 Statement of Facts (Dkt. 135), Plaintiff's response to Defendant's Statement of Facts (Dkt. 158), and Plaintiff's additional

Industry"), a Delaware corporation wholly owned by Mark; (2) UBU Sports, Inc. ("UBU"), a wholly owned subsidiary of Turf Industry; and (3) Turfscape, Inc. ("Turfscape"), a wholly owned subsidiary of Turf Industry. (*Id*.). UBU's primary business was the sale of synthetic turf to sports fields. Turfscape sold franchises that would, in turn, install artificial turf for sports fields. (*Id*.). In 2009, Mark Nicholls assisted Sid Nicholls with incorporating Turf Nation, Inc. ("Turf Nation"), which manufactures the turf used by the other companies. Sid Nicholls is the majority owner and principal of Turf Nation. (Dkt 135, ¶ 9). Mark Nicholls was briefly a board member for Turf Nation but was removed in December 2009. (*Id*. at ¶ 62).

In 2013, Mark formed Turf Industry Holdings, LLC ("TIH") (TIH, UBU, Turfscape, and Turf Industry are collectively referred to as the "Turf Industry Companies"). (Dkt. 158, ¶ 71). Mark intended TIH to operate as a holding company for his own interests in Turf Industry, and as an investment vehicle to raise money for the Turf Industry Companies. (*Id*.). TIH would facilitate outside investment in the Turf Industry Companies because investors could, by purchasing membership interests in TIH, invest in all three operating entities at once. (*Id*.). Sid Nicholls maintains that he has never had the ability to control the Turf Industry Companies. (Dkt. 135, ¶¶ 6, 60-68). Similarly, at the time Plaintiff David Diamond invested in TIH, Mark held no position, role, authority, or ownership interest at or in Turf

---

Statement of Facts (Dkt. 158). Defendant did not respond to Plaintiff's Additional Statement of Facts. Defendant additionally failed to file a reply brief for both his motion for summary judgment and his motion for sanctions.

Nation. (*Id*. at ¶ 9). Since being removed as a director of Turf Nation in 2009, Mark had no ability to control Turf Nation. (*Id*.).

Turf Nation was one of the Turf Industry Companies' primary suppliers of Turf until the Turf Industry Companies went out of business in late 2016. (Dkt. 135, ¶ 10). For several years, the Turf Industry Companies struggled financially. By October 2013, the Turf Industry Companies had over $4 million in obligations and approximately $2 million in trade payables that were overdue. (Dkt. 158, ¶ 72). About half of that amount was owed to Turf Nation. (*Id*.). In December 2013, Mark informed Sid that his companies required nearly $4 million in outside investor capital to pay off the Turf Industry Companies' accounts payable. Sid did not respond well to this information, stating via email "YOU HAVE TOTALLY BLED ME DRY!" (*Id*. at ¶ 70).

In late 2013 and early 2014, Mark Nicholls began attempting to raise capital for the Turf Industry Companies by soliciting private equity investments in TIH. Diamond was one of TIH's early investors. (Dkt. 135, ¶ 13). Diamond asserts that he chose to invest in TIH based on a suite of representations made by Mark. (Dkt. 158, ¶¶ 76-78). Specifically, Mark represented that his previous business in the turf industry, "Sportexe," had been extremely successful. (*Id*.). Mark informed investors that he sold Sportexe for approximately $50 million, 26 times its earnings, and that he personally received $6.5 million in net proceeds (after taxes and his divorce). (*Id*.). Mark represented that he invested that $6.5 million in the Turf Industry Companies. (*Id*.). Those representations were false. Mark, in fact, ran Sportexe into the ground.

(*Id.*). Sportexe fired Mark two years before the sale, and Mark did not receive any money from the sale of Sportexe. (*Id.*).[2]

Believing Mark's representations to be true, Diamond invested in TIH. Diamond made his first $250,000 investment in TIH on May 5, 2014 and his second $250,000 investment on July 28, 2014. (Dkt. 135, ¶ 13). Both investments were executed pursuant to respective Membership Interest Purchase Agreements (the "May 2014 MIPA" and the "July 2014 MIPA"). The terms of each MIPA were substantially identical, and neither referenced Sid Nicholls or any supply agreement. (Dkt. 123, Ex. A, Ex. B). While the first investment came from Diamond's own money, the second came from a loan from Diamond's parents. (Dkt. 146, Ex. A, 26:21-28:14). As discussed more below, Diamond made a third investment of $200,000 in February 2016 pursuant to a Note Purchase Agreement. (Dkt. 135, ¶ 46). From mid-2014 until the Turf Industry Companies shuttered their business in late 2016, Diamond held the position of TIH's "Director of Business Investment." (*Id.* at ¶ 13).[3]

Despite Diamond's investment, the Turf Industry Companies still required more funds. In addition to owing significant funds to creditors, including Turf Nation, TIH owed approximately $2.5 million on a high-interest secured loan with TCA. (Dkt. 158, ¶ 86). TIH defaulted on the TCA loan as of October 3, 2014. (*Id.*). Diamond

---

[2] At the time Mark was fired from Sportexe, Mark owed the company $360,00. (Dkt. 158, ¶ 77). After his termination, Mark and Sportexe entered into a settlement agreement under which Sportexe paid Mark $248,000 in exchange for Mark's equity interest and in lieu of severance. (*Id.*). Mark did not receive $6.5 million dollars from Sportexe.

[3] The parties contest whether this position was an executive level position within TIH. Sid claims Diamond was an executive (Dkt 135, ¶ 13); Diamond claims he was not an executive because he had no authority to bind TIH. (Dkt. 158, ¶ 13).

asserts that unless this loan was repaid, the Turf Industry Companies would be "lost" and all investors and creditors, Turf Nation included, would get nothing. (Dkt. 157, 7-8).

Around August of 2014, Mark Nicholls was introduced to a group of investors, referred to as the "AWP" investors. (Dkt. 158, ¶¶ 88, 90). The parties agree that Diamond was not one of the AWP investors. The AWP investors were interested in investing in TIH and began conducting due diligence.[4] A key due diligence item was confirmation of a supply agreement between UBU and its manufacturers, Turf Nation and Turfstore. (Dkt. 158, ¶¶ 88, 90).[5] On October 3, 2014, Logan Powell emailed Mark Nicholls on behalf of the AWP investors requesting confirmation of such an agreement. The email stated: "Will you please send me your contracts with your 2 manufacturers? Joe [Vrankin] and I discussed this yesterday; we just want to review them to verify that you own the rights to your specific [turf] formula." (Dkt. 135, ¶ 14).

What ensued was a scramble to find an agreement to satisfy the AWP investors' request. According to Sid, the scramble entailed creating a written document to reflect the parties' course of conduct and to reflect a valid agreement already existed. According to Diamond, the scramble entailed a fraud, a sham, a fake agreement by which the parties never intended to be bound but was intended to

---

[4] In addition to investing in TIH, the AWP investors agreed to assist TIH in refinancing the TCA loan with another bank in which they held an ownership interest. (Dkt. 158, ¶ 87).

[5] Sid maintains that he had no affiliation by 2014 with Turfstore. Sid was formerly a co-owner of Turfstore, but he divested himself of all interests in Turfstore in 2007. (Dkt. 135, ¶ 24).

induce investment in TIH. The following comes from the record, including many emails and some deposition testimony. The parties generally agree on the following course of events.

In response to Logan Powell's request, Mark contacted Mike Fedorchuk, counsel for Turfstore and TIH. Mark emphasized the need for a speedy reply to Mr. Powell and asked Mike Fedorchuk if there were any current contracts with Turf Nation and Turfstore that he could review and send to the AWP investors. Mark's October 4, 2014 email to Mike Fedorchuk stated:

> Ultimately, even if we have something it is not going to address what we are being asked for. These guys are offering 2.5 million and funding in just a few weeks. So I need to get them this last thing to be able to close the deal. We are likely to need to draft something that provides what they want and that both Turfstore and Turf Nation are going to be willing to sign. I need to be able to provide this no later than Monday!

(Dkt. 135, ¶ 16). Mr. Fedorchuk responded later that day, stating that he only had a 2010 draft of an older Sportexe agreement. (Dkt. 158, ¶ 93). Mark also asked Sid via telephone if Sid knew of any contracts in effect between Turf Nation and UBU that would meet Powell's request. (Dkt. 135, ¶ 17). Sid informed Mark that he believed such an agreement was drafted "in the beginning of 2013" in anticipation of another investor transaction that fell through. (*Id.*).

Mark told Fedorchuk via email that Sid claimed there may have been a relevant contract from 2013. (Dkt. 135, ¶ 17). Mark admitted that he had not found any agreement to this effect, and asked Fedorchuk to look for one. That night, Mark informed his father that Fedorchuk could not find the 2013 agreement, and that he would start "creating one mid day tomorrow." (Dkt. 158, ¶ 93). On Sunday, October

5, 2014, Fedorchuk wrote to Mark questioning Sid's recollection, stating: "A contract with Turf Nation as recently as 2013? That would surprise me. I certainly didn't draft it […] if Sid signed such a contract it shouldn't be hard for him to find it." (*Id*.). A few minutes later, Sid responded by email saying he could not locate the 2013 contract. (*Id*.).

Mark then started drafting the supply agreements, one between UBU and Turf Nation (the "Turf Nation Supply Agreement") and one between UBU and Turfstore (the "Turfstore Supply Agreement"). (Dkt. 158, ¶ 93). Mark informed Sid that he was creating a new draft that he would send over for Sid to sign. He reminded Sid, "As you know I have time pressure to get this turned around ASAP, so I don't spook the investor." (*Id*.). Mark sent Fedorchuk a draft in the evening of Sunday, October 5, 2014, which Fedorchuk edited and then returned to Mark. Importantly, Mark backdated both agreements to January 15, 2013. (Dkt. 135, ¶ 18).[6] Sid claims that he "took no part in the backdating of the agreement;" although, he eventually signed it. (*Id*.).

Mark then sent the contract to Fedorchuk and Joseph Vrankin (UBU's President and CFO). Mark stated that he would "like to get this in front of Sid [on behalf of Turf Nation] and [John Tidwell, on behalf of Turfstore] tomorrow morning and beg them to review and execute before we spook the investor with the delay."

---

[6] The parties dispute the relevance, purpose, and motive of the backdating. Sid claims that it reflected an earlier agreement between Turf Nation and UBU that had simply not been written down. (Dkt. 135, ¶ 21). Diamond believes it evidences an intent to defraud. Diamond also notes that Sid testified that UBU did not buy turf from Turf Nation until April 2015. (Dkt. 158, ¶ 93). Prior to April 2015, Turf Nation had been selling turf to UBU's parent company, Turf Industry, but not to UBU directly. (Dkt. 135, ¶ 30).

(Dkt. 135, ¶ 19). Mark then sent the agreement to Sid for a signature. Later that night, Fedorchuk questioned whether John Tidwell, Turfstore's executive, would be willing to sign the agreement. (Dkt. 158, ¶¶ 92-93). Mark responded: "I don't know. I am hoping that he will simply sign it because it is the easiest way to get paid. It might be a big fight, I am just going to have to find out." (*Id*.). Mark's next email states: "Because it is post dated he might just turn his head and sign it." (*Id*.).

About an hour later, Sid wrote back to Mark that he would not sign the Turf Nation Supply Agreement.[7] (Dkt. 158, ¶ 93). Sid stated: "NO! I NOW REMEMBER THIS DRAFT! IT'S RIDICULOUS AND POLYTAN, JOHN [TIDWELL] AND MYSELF THOUGHT SO BACK THEN!" (*Id*. at ¶ 21). After going back and forth with Mark, Sid, and Fedorchuk, Fedorchuk amended Section 14(e) of the agreement to accommodate an issue raised by Sid—an early termination clause. (*Id*. at ¶ 93). On October 6, 2014, Sid and Mark executed the backdated Turf Nation Supply Agreement. (*Id*.).

Also on October 6, 2014, Mark emailed a copy of the agreement to John Tidwell, an executive for Turfstore. (Dkt. 158, ¶ 26). Tidwell responded that he was out of the office but would talk to Mark the next day, October 7, 2014. (*Id*. at ¶ 28). On October 7, Tidwell emailed Mark to say that he would call after his morning conference call. Mark responded: "I found documents I need for the request…." (*Id*.). To which Tidwell emailed, "…Glad you got what you needed. Call me when you can." (*Id*.). There is no

---

[7] In response to Sid's refusal, Fedorchuk emailed: "Does no really mean no? Is there some incentive that he's looking for? Is he aware of the TCA [loan] situation? Do we allow for earlier termination? Which is backdated anyway." (Dkt. 158, ¶ 93; Dkt. 159, Ex. 28, 1). Mark responded, in part: "He is aware of the problem with TCA, but not the most intimate details." (*Id*.).

email from Tidwell returning the signed agreement. (*Id.* at ¶ 96). In his deposition, Tidwell testified that he did not recall ever seeing the Turfstore Supply Agreement, he did not sign the Turfstore Supply Agreement, and that the signature on that agreement must have been forged. (*Id.*). He further testified that he did not authorize anyone to affix his signature to the Turfstore Supply Agreement. (*Id.*). Sid maintains that he did not participate in or assist with the execution of the Turfstore Supply Agreement as he had no affiliation whatsoever with Turfstore. Indeed, there is no evidence in the record suggesting that Sid took any part in the execution of the Turfstore Supply Agreement.[8]

The two supply agreements were sent to the AWP Investors on October 7, 2014. (Dkt. 135, ¶ 29). The AWP investors closed on their investment. Although Diamond was not an AWP investor, he maintains that he "would have seen" the two supply agreements because he was TIH's Director of Business Investment, and those agreements would have been "funneled" through Diamond to the AWP investors. (Dkt. 158, ¶¶ 36-37). Diamond also averred that those agreements would have been placed in the Data Room for the AWP investors to view, and to which Diamond had access. (*Id.*).

Mark and Sid intended for the proceeds of the AWP investment to help TIH pay off its creditors, including Turf Nation. (Dkt. 158, ¶¶ 92, 94). Tidwell had told Sid that the investment would close by November 7, 2014, and then November 10, 2014. (*Id.*). On November 14, 2014, Sid emailed Mark to complain that he had not received

---

[8] There are no emails between Sid and Mark regarding the Turfstore Supply Agreement, and Sid was not copied on the emails between Mark and John Tidwell. (Dkt. 135, ¶¶ 24-29).

money from TIH, that he was struggling "to cover my payroll," and that the investor money had not come through to Turf Nation. (*Id*. at ¶ 100). His email concluded: "I AM BARELY HANGING ON BY MY FINGERNAILS AND SOMETHING HAS TO HAPPEN SOON OR EVERYTHING IS GOING TO BLOW UP." (*Id*. at ¶ 73, 100).

About a week before that email, on November 7, 2014, Turf Nation terminated the Turf Nation Supply Agreement. (Dkt. 158, ¶ 98). Sid's affidavit and deposition testimony indicate that Sid terminated the agreement because Turf Industry, UBU's parent company, had not followed through on its promises to pay Turf Nation and because Sid learned that the Turf Industry Companies were insolvent. (Dkt. 135, ¶¶ 31-34). Sid notes that the Turf Nation Supply Agreement required Turf Nation to supply up to $5 million worth of Turf to UBU upon UBU's submission of conforming purchase orders. After learning about UBU's insolvency and Turf Industry's repeated failure to pay for orders, Sid cancelled the agreement. (*Id*.). He claims he did not want to be on the hook for $5 million worth of turf to an insolvent company.

Under the termination clause, Sid was required to send his 30-day termination notice to Mark's home address in Ontario, Canada. (Dkt. 158, ¶ 98; Dkt. 135, ¶¶ 33-34). No other termination notice was required under the Turf Nation Supply Agreement. (*Id*.). Diamond characterizes the termination clause and the fact that Sid sent the termination notice to Mark's home address as a secret or clandestine attempt to conceal the termination from UBU's representatives. (Dkt. 158, ¶¶ 35, 51). Sid contests this characterization, noting that he did not choose the notice address in the

10

contract, and that he was not required to send any other type of notice.[9] Diamond further argues that the fact that Sid terminated the contract only a month after executing it indicates that Sid never intended to be bound by it—in short, that the Turf Nation Supply Agreement was a sham.

Over two years later, in February 2016, Diamond invested another $200,000 in TIH through purchases of convertible notes ("2016 Note Purchase"). (Dkt. 135, ¶ 46). Schedule I of the 2016 Note Purchase Agreement lists material agreements to which TIH was a party. (Dkt. 159, Ex. 33, 31). That Schedule states that there were agreements between TIH and Turfstore, and TIH and Turf Nation, among others. (*Id.*). The Schedule does not identify the agreements—but it does state that an agreement exists between those parties. (*Id.*). Diamond had access to the Data Room prior to making his 2016 investment and the Turf Nation Supply Agreement remained in the Data Room even after its termination in November of 2014. (Dkt. 158, ¶ 37). He claims that he relied on the existence and enforceability of the Turf Nation Supply Agreement in making the 2016 investment. (Dkt. 157, 19-20).

Sid contests whether Diamond could have relied on the Turf Nation Supply Agreement in making the 2016 investment.[10] He first notes that the Turf Nation Supply Agreement had been terminated in November 2014. Sid next argues that Diamond "could never have relied on [the supply agreements'] continued existence

---

[9] In his deposition, Sid testified that Mark worked from his home office in Canada, and when Sid went to confront Mark and another Turf Industry Company executive about UBU's insolvency, he did so at Mark's home office. (Dkt. 159, Ex. 7, 115:13-19, 116:21-25).

[10] Sid also argues that Diamond could not have relied on the supply agreements for his May 2014 and July 2014 investments, because the agreements were not created until October 2014.

because they plainly provided that they could be terminated at any time." (Dkt. 134, 31). More relevant is Diamond's deposition testimony, in which he appears unable to recall whether and when he saw the supply agreements:

> Q: Can you confirm on the record today that on or before February 12, 2016 you saw the Supply Agreement?
>
> A. I don't know
>
>            …
>
> Q. At what time prior to you investing in these companies did anyone represent to you that this Supply Agreement was in effect between Turf Nation and UBU?
>
> A. The one from January of 2013?
>
> Q. Yes.
>
> A. I don't—I don't recall.
>
> Q. Have you ever had a conversation with Sid Nicholls about the Supply Agreement?
>
> A. No.

(Dkt. 135, ¶ 46). In contrast to his deposition testimony, Diamond's affidavit states that he "believe[s]" he reviewed all relevant documents when facilitating the AWP investment. (Dkt. 157, Ex. 1, ¶ 25).

After the termination of the Turf Nation Supply Agreement in November 2014, Turf Nation continued to sell turf to the Turf Industry Companies on an order/invoice basis. Turf Nation sold large quantities of turf to UBU in 2015 and 2016. UBU struggled to timely pay Turf Nation for the turf. As 2016 progressed, UBU's outstanding balance to Turf Nation approached and then exceeded $3 million, the majority of which was more than sixty days past due. (Dkt. 135, ¶ 52).

12

In October 2016, TIH's Board of Directors terminated Mark's employment. (Dkt. 158, ¶ 105). According to Diamond, the Board believed that the Turf Nation Supply Agreement was still in effect and that the Agreement provided for a $5 million line of credit with Turf Nation. (*Id*.). On November 22, 2016, Turf Nation's lawyers informed TIH's Board of the termination notice sent by Sid two years earlier. (*Id*.). According to Diamond, it was at this time that the Board learned that UBU owed millions of dollars to Turf Nation and that UBU had no ability to pay its debts. (*Id*.). Around the same time, and after several demands for payment and warnings, Turf Nation began prosecuting mechanics lien and surety bond actions against UBU for certain turf-related projects. (Dkt. 135, ¶ 53). In January 2017, Turf Nation filed a lawsuit against UBU and its President and CFO, Mr. Vrankin, in the Superior Court of Delaware. (*Id*.).

Diamond's Complaint alleges that had the Turf Nation Supply Agreement been in effect in late 2016, Turf Nation would not have been able to prosecute the above listed actions, and Diamond's investment would have turned out differently. (Dkt. 123, ¶¶ 125-26). Specifically, Diamond alleges that Section 5(e) of the Turf Nation Supply Agreement created a $5 million revolving line of credit. (*Id*.). If the Agreement had not been terminated, Turf Nation would not have been able to exercise remedies against UBU because UBU only owed Turf Nation $3 million—less than the line of credit amount. (*Id*. at ¶¶ 92, 125-26). Sid counters that the Agreement did not create a revolving line of credit, it "simply required Turf Nation to supply up to $5 million worth of Turf to UBU" as long as UBU was not otherwise in default under the

agreement. (Dkt. 134, 23-24). Sid also argues that even if the Turf Nation Agreement was in effect, the Turf Industry Companies had been insolvent for months (arguably, years), and would likely have gone under anyway. (*Id.*).

Finally, Sid asserts that he had no involvement in the decision to seek outside investors and did not solicit investors. Sid also repeatedly asserts that he never made any representations to Diamond at all. During his deposition Diamond could not recall a single substantive communication that Sid participated in:

> Q. Okay. If you could turn to Paragraph 29 on Page 8 of the Complaint. Paragraph 29 says that Mark met or spoke with investors and potential investors, including the Plaintiff, numerous times in 2014 and 2015 [...] Did I read that correctly?
>
> A. Yes.
>
> Q. And then it goes on to list about 25 occurrences which are meetings, communications, telephone calls, all of which occurred between, according to you, January, 2014 and June 2015, right?
>
> A. Yes.
>
> Q. Let's start with the meeting. Which one of those did Sid Nicholls attend?
>
> A. He was not in actual attendance at these meetings.
>
> Q. Okay. And the phone calls, which one of those did Sid Nicholls participate in?
>
> A. He was not in attendance as far as I know.
>
> Q. And the communications, which one of those did Sid Nicholls send or receive?
>
> A. I don't know.
>
> ...

14

> **Q.** Did Sid Nicholls ever make a direct statement to you in a conversation in person or over the telephone or via e-mail or by any other method that you claim to have relied on in connection with your investment in the Turf Industry Companies?
>
> ...
>
> **A.** A direct statement, no.

(Dkt. 135, ¶¶ 58-59).

### 2. Facts Relevant for Rule 11 Motion

In his motion for sanctions under Rule 11, Sid provides a "plethora" of relevant facts. The Court only relays those most relevant for its ruling.

Although some of the funds Diamond invested belonged to Diamond himself, a substantial portion of his investment came from family money, contributed by Diamond's parents and his mother-in-law. (Dkt. 146, 9). In addition to convincing his own family to fund his investment, Diamond also convinced many other investors to invest in TIH. (Dkt. 146, Ex. B). Sid alleges that after the Turf Industry Companies failed, Diamond was "angry, embarrassed, and seeking to save face" after losing thousands of dollars of his and his families' money, and convincing friends and acquaintances to invest in TIH. (Dkt. 146, 10).

Apparently, in addition to losing money, two unrelated actions made Diamond "furious." (Dkt. 146, 10). Mark Nicholls took the first action. In October 2016, TIH's board terminated Mark's employment as CEO. (*Id*.). The Turf Industry Companies then sold some property, including trademarks, to Act Global. (*Id*.). Some of TIH's investors became shareholders in Act Global, and several executives moved to Act Global, including Diamond and Joseph Vrankin, President and CFO of UBU. (*Id*.). After Mark's termination, he initiated a lawsuit in the Chancery Division of the

Circuit Court for DuPage County, Illinois (Case No. 2016 CH 1721, the "DuPage Action"), against TIH, TIH's board members, and Diamond individually. (*Id.* at 11). Sid Nicholls had nothing to do with the DuPage Action.

Sid Nicholls took the second action. Turf Nation, controlled by Sid, initiated various collection actions against the Turf Industry Companies in late 2016 and early 2017, which culminated in Turf Nation commencing a lawsuit against UBU and Joseph Vrankin in the Superior Court of Delaware (the "Delaware Action"). (Dkt. 146, 11). In the Delaware Action, Turf Nation sued UBU for breach of contract regarding turf that UBU had ordered and accepted but failed to pay for, and sued UBU and Vrankin for violations of state law construction trust fund statutes.[11]

According to Sid, the DuPage action infuriated Diamond because he felt wrongfully named as a defendant in an action by Mark, the person he believed was responsible for the Turf Industry Companies' failure. Regarding the Delaware action, Diamond was sympathetic to Turf Nation's claim but thought it "preposterous that Vrankin was named. (Dkt. 146, Ex. A, 132:22-133:6) ("we didn't blame Sid for wanting—I mean, you were absolutely right what you said earlier, Sid deserved his money back. What was unacceptable to the board at the time was who was truly responsible and that was his son Mark Nicholls, because he was the CEO of the business. And the fact that Joe Vrankin was named was pretty preposterous.").

---

[11] The trust fund claims stemmed from the fact that UBU installed Turf Nation's turf on certain projects, accept payment from the owners and contractors, but failed to pass on that money to Turf Nation for the supplied turf. (Dkt. 146, 11 fn. 7). It appears that Vrankin, Diamond, and other Turf Industry executives were unaware of the trust fund statutes and were thus surprised by the Delaware Action. (*Id.* at 12).

Diamond responded to these two actions by asserting counterclaims against Turf Nation, all related to the Turf Nation Supply Agreement. Sid argues that these counterclaims were an attempt to exact revenge on Mark and Sid. (Dkt. 146, 15). Diamond proceeded to solicit participation in a civil action against Mark and Sid, with the express purpose of "punishing" Mark and Sid, stopping Mark from making comments about Act Global, and creating leverage for settling the Delaware Action. (Dkt. 146, Ex. F) (in an email soliciting plaintiffs, Diamond stated: "For me personally, and other investors I have spoken to, there is a strong belief that Mark and Sid Nicholls need to be punished; moreover, because Mark Nicholls continues to lie about things with respect to Act Global…it is in the best interest of the investors to put a stop to this nonsense."). None of TIH's shareholders joined the suit. However, Diamond convinced TIH's board to have TIH contribute $100,000 towards attorneys' fees for this suit, even though TIH was insolvent. (Dkt. 146, 16).

Diamond again attempted to solicit more plaintiffs for this suit. In doing so, he forwarded the attorney engagement letter and stated, in part:

> … [it will take $100,000], conservatively, to get us through the Complaint filing and through the defense of Mark and Sid's Motion to Dismiss.

> After that period of time, assuming the case is not dismissed, Mark and Sid will be brought to the table for global settlement. Since our goal is to call the industry's attention to their fraud and alleviate harm to the UBU brand and the lying regarding Act Global, there is no reason to take the case further. In a nutshell, while Sid may have money, it would not be worth our while to spend hundred[s] of thousands of dollars to find out.

(Dkt. 146, Ex, G). A few days later, Joseph Vrankin and Diamond emailed Thrall Enterprises and Dan Potts, another shareholder, asking if they would join the lawsuit. Dan Potts asked the Thralls to provide their understanding of the purpose of his lawsuit, to which the Thralls responded: "They want all the plaintiffs to sign the engagement letter. We have been told that [TIH] will pay all legal fees…I think their strategy still is to use this suit to get Nicholls to drop his suit and to agree to stop making negative comments about Act Global. I don't think they are expecting to get any cash out of this." (*Id*. at Ex. H).[12]

Sid next points to the text of the First and Second Amended Complaints and compares them to Diamond's deposition testimony to show that Diamond knowingly lied in the Complaints in order to survive a motion to dismiss. For example, the First Amended Complaint stated: "Sid participated, with his son Mark, in the marketing and sale of shares in TIH…including in direct and oral conversations with Plaintiff" and "Sid also spoke with Plaintiff by phone and e-mail on numerous occasions…." (Dkt. 29, ¶¶ 11, 30). Yet Diamond stated in his deposition that he never had a direct conversation, phone call, email, meeting, etc. with Sid. (Dkt. 135, ¶ 58). Sid claims that Diamond had knowledge about his own conversations, phone calls, meetings, and that it is extremely unlikely that Diamond thought he had meetings with Sid at the time he filed the Complaint in 2017, and then realized at the time of his deposition in 2018 that he did not have any such meetings.

---

[12] Deposition testimony from Thrall indicates that "Nicholls" referred to Mark Nicholls. (Dkt. 146, 18-19).

After discovery closed in 2019, and after Sid filed his first Rule 11 motion, Diamond sought leave to file a Second Amended Complaint which the Court granted over Sid's objection. (Dkt. 122). The Second Amended Complaint removed the paragraphs cited above, but, according to Sid, kept other "blatantly false allegations." (Dkt. 146, 21-22).[13] In addition, the Second Amended Complaint added allegations regarding the forgery and backdating of the Turfstore Supply Agreement. Sid notes that there is no evidence in the record that shows that Sid participated in the creating of the Turfstore Supply Agreement, and there are no emails between Sid and Mark regarding the Turfstore Supply Agreement. (*Id*. at 22-23). Sid also protests that these allegations were added well after the close discovery. (*Id*.).

Sid makes essentially two arguments in favor of sanctions: 1) Diamond knowingly lied in the First and Second Amended Complaints by making allegations not supported by evidence in order to survive a motion to dismiss, and 2) Diamond brought this lawsuit for an improper purpose, to force settlement with no intention of prevailing on the merits and to "save face." Diamond does not contest the relevant factual background, but rather argues that the suit was not brought for an improper purpose, and that Diamond fully intended to prevail on the merits after the other TIH shareholders declined to join the suit. (Dkt. 178, 12) (citing Dkt. 178, Ex. 4, 155:22-157:7, 169:19-170:2) ("everything changed when [the other shareholders] declined and I decided to go after [Sid and Mark] myself...I know for a fact that my

---

[13] The Second Amended Complaint also withdrew Plaintiff's Federal 10(b)(5) claim because "the Illinois Securities Law claim does not require a showing of scienter or loss causation." (Dkt. 121, 8).

decision…[was] that I was going in to get justice… So for me it was the primary and the only reason… I lost everything").[14]

## LEGAL STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.*

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex*, 477 U.S. at 323 (1986). After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quotation omitted). "It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence on which he relies." *Harney v. Speedway SuperAmerica*, LLC, 526 F.3d 1099, 1104 (7th Cir. 2008). Construing the evidence and facts supported by the record in favor of the non-moving

---

[14] Diamond also cites to Joseph Vrankin's deposition testimony stating that Diamond "absolutely believed that Mark Nicholls and Sid Nicholls had committed securities fraud and a number of other common law fraud… He was extremely upset that he felt that he was conned and defrauded out of his entire investment by father and son and he wanted his money back based on that." Vrankin further stated that Diamond "believed he has a strong case against Mark Nicholls and Sid Nicholls, which I concur that I believe that as well and knowing that, it could put pressure on potential settlement with other litigations." (Dkt. 178, Ex. 5, 322:9-323:17).

party, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.* (citation omitted).

## ANALYSIS

The crux of Sid's motion for summary judgment is that he did not make any representations to Diamond at all, let alone those that would have affected Diamond's decision to invest in TIH. Sid did not solicit Diamond's investment or otherwise convince Diamond to invest, either in 2014 or 2016. According to Sid, the record indicates that Diamond did not read the Supply Agreements and thus could not have relied on them; and even if Diamond read them, he could not rely on their continued existence because they could be terminated at any time by either party. Sid moves for summary judgment on each claim and moves for sanctions under Rule 11.

It is clear to the Court that the only potentially actionable investment is Diamond's 2016 investment. Diamond's theory of the case is that Sid helped Mark wrongfully induce investments by creating and backdating sham Supply Agreements. Those Agreements were not created until October 2014, several months after Diamond's May 2014 and July 2014 investments. In fact, in describing the alleged misrepresentations that induced his 2014 investments, Diamond refers only to

Mark's representations about his prior success with Sportexe.[15] There is no evidence in the record connecting Sid to any of these misrepresentations. The Court accordingly addresses the parties' respective arguments as they pertain to Diamond's 2016 investment.

## 1) Illinois Securities Law

Sid argues that he is entitled to summary judgment on this claim because he is not a proper defendant. (Dkt. 134, 32). The Illinois Securities Law limits the class of potential defendants to "the issuer, controlling person, underwriter, dealer or other person by or on behalf of whom the sale was made, and each underwriter, dealer, internet portal, or salesperson who shall have participated or aided in any way in making the sale…" 815 ILCS 5/13(A); *see also Excalibur Oil, Inc. v. Sullivan*, 616 F.Supp. 458, 466 (N.D. Ill. 1985) (class of defendants limited to those listed in 815 ILCS 5/13). The parties appear to agree that Sid is not an internet portal, underwriter, issuer, or dealer. Diamond argues that Sid is a controlling person and a person on behalf of whom the sale was made. The Court shall address each argument in turn.

In contrast to the federal securities laws, "the Illinois Act is a far more restrictively structured statute." *Excalibur*, 616 F.Supp. at 466. The Act defines a controlling person as:

> any person offering or selling a security, or group of persons acting in
> concert in the offer or sale of a security, owning beneficially… either (i)
> 25% or more of the outstanding voting securities of the issuer of such
> security…, or (ii) such number of outstanding securities of the issuer of
> such security as would enable such person, or group of persons, to elect

---

[15] Mark was dismissed from this suit on March 4, 2019 pursuant to a settlement. (Dkt. 98).

> a majority of the board of directors…In case of unincorporated issuers,
> "controlling person" means any person offering or selling a security, or
> group of persons acting in concert in the offer or sale of a security, who
> directly or indirectly controls the activities of the issuer.

815 ILCS 5/2.4. "The Act makes officers and directors of a corporation liable, and also those performing similar functions, where such persons participated in or aided in making the sale of securities." *Froehlich v. Matz*, 93 Ill.App.3d 398, 408, 417 N.E.2d 183, 191 (1981). In participating or aiding the sale, "a controlling person need not always take overt action, but 'there must be some showing of assent, approval or concurrence, albeit tacit approval, in the action of the group selling securities, before an individual will be held liable for the action of the controlling group.'" *Elipas v. Jedynak*, No. 7 C 3026, 2010 WL 1286795, at *5 (N.D. Ill. Mar. 26, 2010) (citing *Seibt v. Peterson*, 609 F.Supp. 990, 991 (N.D. Ill. 1985)). "Some connection with the sale, or decision to sell, securities is required under the statute." *Id.* (citing *Froehlich*, 93 Ill.App.3d at 406).

Diamond relies on *Froehlich* and *Jacobs v. James*, 215 Ill.App.3d 499, 504, 574 N.E.2d 1219, 1296 (1991), to argue that Sid is a controlling person. Yet those cases are distinguishable for several reasons. First, in *Froehlich*, Defendant Froehlich was found liable as a control person because he was a shareholder who participated in the decision to sell securities. *Froehlic*, 93 Ill.App.3d at 411-12. Froehlich had been defrauded, and to recoup his own investment he solicited and defrauded new investors. *Id.* The court found Froehlich participated in and concurred with the decision to sell securities. The *Jacobs* court deemed the defendant a control person because he owned more than 25% of the outstanding shares of the relevant company,

and he voted with another shareholder to sell securities. *Jacobs*, 215 Ill.App.3d at 505. Even though the defendant in *Jacobs* did not personally solicit the plaintiffs, he voted for and approved the sale of securities. *Id*. (even though defendant had "no specific knowledge of who was solicited to buy stock, and did not personally solicit them, he was liable 'because of his action in concert with the other early investors in the decision to actively seek new investors'") (citing *Froehlich*, 93 Ill.App.3d at 411). Conversely, the court in *Froehlich* found Defendant Matz not liable as a control person because Matz was not a shareholder and he "took no part in the decision to sell securities nor in the sales." *Id*. at 406.

The Court finds Sid Nicholls is like Defendant Matz. Just like Matz, there is no evidence that Sid was a shareholder of TIH. Nor was Sid a member of TIH's board or an executive within TIH. There is no evidence that Sid controlled the activities of TIH, the issuer of the relevant securities. Diamond argues that Sid was the de facto CFO of the Turf Industry Companies, yet the record does not support such an inference.[16] Furthermore, and unlike the cases relied on by Diamond, there is no indication that Sid prompted or facilitated *Mark's* decision to solicit securities for TIH. Sid did not vote on the decision like the defendant in *Jacobs* (nor could he), nor did he participate in any of the solicitation efforts. Diamond's own testimony indicates

---

[16] Sid was acting CFO of Turf Industry in January and February of 2013 to fill a vacancy left by the former CFO's departure. This was over a year before Mark solicited Diamond's 2014 investment and three years before Diamond's 2016 investment. There is additionally no evidence Sid was CFO of TIH, and TIH is the actual issuer of securities and the entity in which Diamond invested in 2016. (Dkt. 158, ¶ 103).

that Sid did not participate in any meetings, phone calls, conversations, or emails related to Diamond's decision to invest. (Dkt. 135, ¶¶ 57-58).

Diamond argues that Sid's attendance at a meeting in Toronto, Canada with Beacon Securities evidences Sid's involvement and participation in TIH's fundraising efforts. (Dkt. 157, 25-26; Dkt. 158, ¶75). Contrary to Diamond's characterization, the record indicates that Beacon Securities was providing a presentation to solicit Mark's business, not the other way around. (Dkt. 159, Ex. 6, 44:2-16). Mark and Sid were not attempting to solicit Beacon's investment in the Turf Industry Companies or TIH. And regardless, Sid's testimony clearly indicates that he attended the meeting as a passive observer, not as a key decision maker. (Dkt. 159, Ex. 7, 287:6-9, 289:24-25). Even if Sid participated in the meeting with Beacon Securities, as Diamond suggests, he is not a control person. This meeting does not counteract the fact that Sid was not a board member, executive, shareholder, and that Sid did not participate in the decision to sell and solicit securities.

Given the record before the Court, Sid is not a control person under the Illinois Securities Law.

Diamond next argues that Sid is a person on behalf of whom the sale was made. Diamond provides no legal authority for this argument. Instead, Diamond rests on his own assertion that it is clear Mark needed the investment to pay Sid, therefore the sale was made on behalf of Sid. *See Duehning v. Aurora E. Unified School Dist. 131*, No. 13 C 5617, 2015 WL 500876, at *3 (N.D. Ill. 2015) (a court is not required to conduct legal research and construct arguments for a represented party). On the

contrary, the record indicates that Sid is not a proper defendant under the Illinois Securities Law. The Court declines to reach the remaining elements. Summary judgment is granted on this claim.

## 2) Conspiracy to Breach Fiduciary Duty

Sid argues that he is entitled to summary judgment on the conspiracy to breach fiduciary duty claim for several reasons: 1) there is no evidence of an agreement, 2) Diamond failed to show Mark owed Diamond a fiduciary duty, 3) there is no evidence that the Supply Agreements affected Diamond's decision to invest, and 4) Diamond has failed to demonstrate proximate cause and damages.

Under Illinois law, a civil conspiracy is defined as: "(1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Foodcomm Intern. v. Barry*, 463 F.Supp.2d 818, 830 (N.D. Ill. 2006) (citing *Fritz v. Johnston*, 2019 Ill.2d 302, 282 Ill.Dec. 837, 807 N.E.2d 461, 470 (2004)). Civil conspiracy is an intentional tort that requires proof that a defendant "knowingly and voluntarily participates in a common scheme to commit an unlawful act or a lawful act in an unlawful manner." *Adcock v. Brakegate, Ltd.*, 164 Ill.2d 54, 206 Ill.Dec. 636 645 N.E.2d 888 (1994). However, accidental, inadvertent, or negligent participation in a common scheme does not amount to a civil conspiracy. *Id*. But a defendant "who understands the general objectives of the conspiratorial scheme, accepts them, and

agrees, either explicitly or implicitly[,] to do its part to further those objectives…is liable as a conspirator." *Id*.

Here, it appears that the alleged breach of fiduciary duty is the inducement to invest based on a Supply Agreement that was backdated. *See Premier Capital Mgmt., LLC v. Cohen*, No. 2 C 5368, 2008 US WL 4378313, at *2 (N.D. Ill. Mar. 24, 2008). In order for Sid to further Mark's breach of fiduciary duty, Mark must first owe fiduciary duties to Diamond.[17] The parties agree that Mark did not owe Diamond a fiduciary duty prior to Diamond's first investment in May 2014. (Dkt. 157, 28 fn. 9). Mark only owed Diamond such a duty after Diamond became a shareholder. Consequently, Mark owed fiduciary duties to Diamond for Diamond's July 2014 investment and February 2016 investment. Although, as noted above, the only potentially actionable investment is Diamond's 2016 investment. Thus the question becomes, did Mark owe a fiduciary duty to Diamond in 2016, and did Sid further Mark's breach of that duty?

For purposes of this motion, the Court assumes that Mark had a fiduciary duty to Diamond and that Mark breached that duty by inducing Diamond's investment in 2016. However, Diamond's claim against Sid must still fail.[18] A claim for conspiracy cannot be accidental, *Foodcomm*, 463 F.Supp.2d at 830, thus, Diamond must present evidence that Sid knew he was helping Mark breach fiduciary duties owed to

---

[17] Diamond does not assert that Sid owed him a fiduciary duty.

[18] Sid argues that Diamond "has not shown that any fiduciary duty was in fact owed." (Dkt. 134, 38). Diamond does not address the question except to assert that "[t]here can be no question that Mark Nicholls, CEO of TIH, … owed a fiduciary duty to the equity owners of TIH." (Dkt. 157, 34). In support, Diamond cites to a Georgia case, noting that under Georgia law, a manager's liability may not be limited to intentional misconduct. (Dkt. 157, 34) (citing *Argentum Int'l, LLC v. Woods*, 280 Ga.App. 440, 447-48, 634 S.E.2d 195, 203 (2006). Diamond provides no explanation as to why Georgia law is relevant to this Illinois action.

Diamond. Diamond has failed to make that showing. There is no evidence that Sid knew that by signing and drafting a backdated agreement, he was assisting Mark's inducement of Diamond's investment, or assisting Mark's breach of fiduciary duties owed to Diamond. On the contrary, the record indicates that Sid participated in the backdating of the Agreement to induce investment from the AWP investors—not Diamond.[19] Even Diamond's brief highlights this point. Diamond argues that Sid knew that "execution of [the supply agreements] was necessary to prevent 'spooking' investors and to induce investments." (Dkt. 157, 34). But the extensive emails from the parties indicate that Sid knew speedy execution of the Supply Agreements was necessary to prevent "spooking" the AWP investors—again, not Diamond. Sid's conduct in October 2014 had nothing to do with Diamond 2016 investment. Indeed, Diamond did not make the relevant investment until February 2016, almost a year and half after Sid signed the backdated agreement.

There is additionally no evidence in the record that Sid committed an overt act to further Mark's breach of fiduciary duty in 2016. As noted above, the alleged breach is the inducement to invest. There is no evidence that Sid had anything to do with the 2016 Note Purchase Agreement (Diamond's sole "hook" for improper inducement), there is no evidence that Sid listed an agreement with Turf Nation on Schedule I. There is no evidence that Sid perpetuated the ruse by informing Diamond that the Turf Nation Supply Agreement still existed or added the agreement to the Data

---

[19] A plaintiff may bring a breach of fiduciary duty claim to redress wrongs perpetrated against him; a plaintiff may not bring a breach of fiduciary duty claim to redress wrongs perpetrated against someone else. *See Gas Tech. Inst. v. Rehmat*, 524 F.Supp.2d 1058, 1070 (N.D. Ill. 2007). As noted above, both parties agree that Diamond was not an AWP investor.

Room. Diamond argues that Sid's secret termination of the Turf Nation Supply Agreement constitutes an overt act in furtherance of the conspiracy to breach fiduciary duties owed to Diamond. Yet this argument suffers from the same flaws. The record, if anything, indicates that Sid understood he was assisting Mark in inducing investment from the AWP investors. There is no indication that Sid understood he was doing anything related to Diamond at all.[20] Summary judgment is granted on this claim.

### 3) Aiding and Abetting Breach of Fiduciary Duty

Diamond contends that Sid is liable for aiding and abetting a breach of fiduciary duty. To be liable for aiding and abetting a breach of fiduciary duty under Illinois law: "(1) the party whom the defendant aids must perform a wrongful act which causes an injury; (2) the defendant must be regularly aware of his role as part of the overall or tortious activity at the time that he provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation." *Timothy & Thomas LLC v. Viral Genetic, Inc.*, No. 6 C 1813, 2010 WL 3155972, at *22 (N.D. Ill. Aug. 10, 2010) (citing *Thornwood, Inc. v. Jenner & Block*, 344 Ill.App.3d 15, 27-28, 278 Ill.Dec. 891, 799 N.Ed.2d 756 (1st Dist. 2003)); *see also* Restatement (Second) of Torts § 876 (1979). A claim for aiding and abetting cannot survive "without

---

[20] There is additionally no evidence that Sid had anything to do with the Turfstore Supply Agreement. Despite Diamond's allegations to the contrary, there is no evidence that Sid forged the Turfstore Agreement or even viewed the Turfstore Agreement. There are no emails between Sid and Mark discussing the Turfstore Agreement, and Sid was not copied on Mark's emails to John Tidwell. (Dkt. 135, ¶¶ 24-29). The Court notes Tidwell's testimony that his signature was likely forged, and that he did not authorize anyone to sign an agreement for him and has never seen the Turfstore Supply Agreement. (Dkt. 158, ¶ 100). However compelling that testimony may be, there is no evidence linking the forged signature to Sid—the only defendant in this suit. Sid cannot be liable for any claims related to the Turfstore Supply Agreement.

an underlying actionable tort that the defendant aided and abetted, resulting in his or her liability for that underlying tort." *Id.* (citing *Yates v. John Marshall Law School*, No 8 C 4127, 2009 WL 1309516, at *7 (N.D. Ill. May 11, 2009)).[21]

Applying *Thornwood's* three-part test to the facts at hand, to prevail on his claim, Diamond must show that Sid: (1) knew that Mark was a fiduciary to Diamond and that Mark was breaching his fiduciary relationship by inducing Diamond to purchase shares in 2016 (based on Supply Agreements that had already been cancelled); (2) was aware that his activities were helping Mark induce Diamond's 2016 investment; and (3) knowingly and substantially assisted in the inducement. *See Premier Capital Mgmt, LLC v. Cohen*, No. 2 C 5368, 2008 WL 4378313, at * (N.D. Ill. Mar. 24, 2008). In other words, Diamond needs to establish a triable issue of fact regarding whether Sid knowingly and substantially helped Mark induce additional investment from Diamond in 2016.

This claim suffers from many of the same flaws addressed above. Diamond has not made the requisite showing. He fails to do more than present facts and arguments related to Mark's misrepresentations to Diamond in 2014, and Sid's involvement with the AWP investors in 2014. Diamond fails to raise a question of material fact regarding whether Sid's actions substantially assisted inducement of funds from Diamond in 2016. The record indicates that Sid had no direct involvement in inducing Diamond to invest. As described above, there is no evidence that Sid participated in

---

[21] Sid argues that he is entitled to summary judgment on this claim because Diamond cannot establish the underlying breach of fiduciary duty and Sid's knowledge of that breach. The Court declines to reach whether there was an underlying breach of fiduciary duty, as summary judgment is appropriate on other grounds.

drafting the 2016 Note Purchase Agreement, no evidence that Sid even knew what was in Schedule I at the time, no evidence that Sid had a conversation with Diamond regarding the Supply Agreements. No reasonable jury could find in favor of Diamond on such tenuous inferences. There is no evidence Sid helped Mark induce Diamond's investment in February 2016—through a breach of fiduciary duty or otherwise.

### 4) Common Law Fraud

Illinois common law fraud requires "(1) a false representation of material facts as opposed to opinion; (2) made by one who knew or believed that representation to be untrue; (3) made to a party who had a right to rely on the representation and, in fact, did so; (4) made for the purpose of inducing the other party to act, or to refrain from acting; and (5) that led to injury to the person who relied on it." *Meyer v. Ward*, No. 13 C 3303, 2016 WL 5390953, at *5 (N.D. Ill. Sep. 27, 2016) (citing *McCarthy v. PaineWebber, Inc.*, 618 F.Supp. 933, 941 (N.D. Ill. 1985)).

Sid presents a suite of arguments in defense of this claim: 1) Sid never made a misrepresentation to Diamond, 2) Diamond did not and could not have relied on the Turf Nation Supply Agreement, and 3) relying of the Turf Nation Supply Agreement could not have caused loss to Diamond because UBU and the Turf Industry Companies were insolvent and would have gone under anyway. The first argument is dispositive. There is no evidence in the record that Sid made any representations or misrepresentations to Diamond.

Diamond claims that the relevant misrepresentation is that "embodied by the Turf Nation Contract." (Dkt. 123, ¶ 172). Diamond has not provided any authority to

suggest that the Turf Nation Supply Agreement constitutes a misrepresentation made by Sid. Even Diamond's own testimony indicates that Sid never made a representation to Diamond regarding the Turf Nation Supply Agreement or otherwise. There is no evidence that Sid discussed or even mentioned the Supply Agreement to Diamond at any point in time, that Sid induced or even discussed Diamond's 2016 investment, told Diamond that the Supply Agreement was still in effect, drafted the 2016 Note Purchase Agreement, or placed the Agreement in the Data Room. Simply put, there is no representation by Sid that Diamond could have relied on. Summary judgment is granted as to this claim.

## 5) Conspiracy to Defraud

Sid argues that he is entitled to summary judgment on this claim for the same reasons he is entitled to summary judgment on the conspiracy to breach fiduciary duties claim: there is no evidence of an agreement between Mark and Sid, and there is no evidence that Sid and Mark were attempting to defraud Diamond when they executed the backdated Supply Agreements. Diamond counters that Sid took an active role in planning for the sale of TIH securities by attending the Beacon Securities meeting in Toronto, helping Mark create the backdated agreements, and by secretly cancelling the Supply Agreements.

For all the reasons enumerated above, Sid is entitled to summary judgment on this claim. There is simply no evidence that Sid knew he was assisting Mark defraud Diamond or induce investment from Diamond when he executed or cancelled the Turf Nation Supply Agreements.

32

## 6) Rule 11 Motion for Sanctions

As described above, Sid makes two arguments for sanctions: 1) Diamond's attorneys violated Rule 11(b)(3) by asserting factual allegations not supported by evidence, and Diamond was responsible for such violation;[22] and 2) Diamond's attorneys violated Rule 11(b)(1) by filing this suit for an improper purpose. Sid requests dismissal of the suit with prejudice and attorney's fees for the entire suit.

Under Rue 11, the court may impose sanctions if a lawsuit is "not well grounded in fact and is not warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law." *Cuna Mut. Ins. Soc'y v. Office and Prof'l Employee Int'l Union, Local 39*, 443 F.3d 556, 560 (7th Cir. 2006) (citing *Nat'l Wrecking Co. v Int'l Bhd. of Teamsters, Local 731*, 990 F.2d 957, 963 (7th Cir. 1993)). Rule 11(b)(3) requires that the factual contentions in a complaint "have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. Pro. 11(b)(3). Rule 11(b)(1) certifies that the case is not being presented for "any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." Fed. R. Civ. Pro. 11(b)(1). "A paper interposed for any improper purpose is sanctionable whether or not it is support by the facts and the law, and no matter how careful the pre-filing investigation." *Mars Steel Corp. v. Cont'l Bank N.A.*, 880 F.2d 928, 931-32 (7th Cir. 1989) (internal quotation marks omitted). In

---

[22] The Court notes Diamond accuses Sid of committing fraud on the Court and argues such conduct should result in a summary denial of Defendant's motion for summary judgment. (Dkt. 157 at 2-3 and n. 1 & 2).

determining whether sanctions are appropriate, the Court must make an objective inquiry. *Thornton v. Wahl*, 787 F.2d 1151, 1154 (7th Cir. 1986). When, however, the suit is objectively colorable, a court may consider subjective bad faith or malice. *See Brown v. Federation of State Medical Boards*, 830 F.2d 1429, 1436 (7th Cir. 1987); *Alpern v. Lieb*, 38 F.2d 933, 935-36 (7th Cir. 1994) (Rule 11's "improper purpose" clause has both objective and subjective components).

Sid argues that Diamond's lawyers violated Rule 11(b)(1) by knowingly filing the Second Amended Complaint that contained allegations for which there was no evidentiary support.[23] In particular, Sid believes that Diamond never read the Supply Agreements and therefore could not have relied on them in making his 2016 investment, and that Diamond knew there was no evidence that the Supply Agreement created a $5 million revolving line of credit. (Dkt. 146, 27). Diamond largely construes Sid's argument regarding 11(b)(3) as an argument that Diamond's claims are frivolous. (Dkt. 178, 7). Diamond thus responds that his claims are meritorious and supported by evidence.

Although the Court is granting summary judgment for Sid, and although the veracity of Diamond's allegations is questionable, the Court cannot say that Diamond's claims were "so devoid of factual support that sanctions were appropriate." *Great Eastern Entertainment Co., Inc. v. Naeemi*, No. 14 C 4731, 2015 WL 6756283, at * (N.D. Ill. Nov. 5, 2015) (quoting *Bilharz v. First Interstate Bank of Wisc.*, 98 F.3d 985, 989 (7th Cir. 1996)). The Court declines to sanction Diamond on this basis.

---

[23] Sid concedes that the allegations in the First Amended Complaint are not directly sanctionable as that is no longer the operative pleading. (Dkt. 146, 22).

Sid next argues that Diamond's attorneys have violated Rule 11(b)(1) because Diamond's claims were presented for the following improper purposes: 1) to "punish" Mark and Sid for the Delaware Action and DuPage Action by destroying their reputations in the artificial turf industry; 2) create leverage to force a settlement; 3) stop Mark from making negative comments about Act Global; 4) seek revenge on Mark for, from Diamond's perspective, causing Diamond to lose his and his family's money. (Dkt. 146, 29). Diamond responds that he did not file suit for an improper purpose as he intended to win on the merits, that leveraging settlement and adverse publicity are not improper purposes as a matter of law, and that his current attorneys are not those who drafted and filed the First Amended Complaint.[24]

Diamond relies exclusively on out of circuit caselaw to argue that filing a suit to leverage a settlement in a different suit is not an improper purpose under Rule 11, and that courts should not engage in a subjective inquiry into the plaintiff's mental state. The Seventh Circuit takes a different stance on the subjective inquiry, as noted above. *See Brown*, 830 F.2d at 1436 (a court may consider subjective bad faith or malice); *Alpern*, 38 F.2d at 935-36 (Rule 11's "improper purpose" clause has both objective and subjective components). It is additionally not clear to this Court that the Seventh Circuit follows Diamond's cited cases regarding settlement as an improper purpose. Regardless, there is no indication that Diamond's actions rise to the level of sanctionable conduct. The emails cited by Sid indicate that Diamond was indeed frustrated, even angry, and that he hoped this suit would precipitate a

---

[24] This last point ignores the fact that Sid is not seeking sanctions for the First Amended Complaint and has raised issues regarding allegations in the Second Amended Complaint.

settlement. But Diamond also repeatedly protested that he had been wronged, in the legal sense, and was seeking justice. (Dkt. 178, Ex. 4, 155:22-157:7, 169:19-170:2). The Court declines to find that Diamond acted out of an improper purpose. Sid's motion for sanctions is denied. (Dkt. 141).

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment [133] is granted and Defendant's motion for sanctions [141] is denied.

E N T E R :

Dated: September 1, 2020

_____
MARY M. ROWLAND
United States District Judge